COMMONWEALTH *vs.* FRANK TARVER.

Suffolk.   March 4, 1975. — December 22, 1975.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Homicide.   Rape.   Constitutional Law*, Search and seizure, Due process of law. *Search and Seizure.   Probable Cause.   Evidence*, Opinion: expert; Leading question; Photograph.   *Witness*, Expert.   *Identification.   Practice, Criminal*, Disclosure of evidence before grand jury.

Where a defendant had been arrested for one crime and promptly after his arrival at the police station hair samples were snipped from his head, chest and pubic area in connection with investigation of a second crime unrelated to that for which he had been arrested, and where at the time of his arrest the police had probable cause to charge him with the second crime, the taking of the hair samples was a valid search incident to a lawful arrest. [305-310]

At a criminal trial there was no error in the admission of expert testimony, based on microscopic comparison of samples of the defendant's hair with hair taken from the victim's body, although such testimony could not identify the hair found on the body but could only exclude large classes of persons as the source of the hair. [310-311]

Although a witness at a criminal trial had been only eight years old at the time of the offense and although he had identified the de-

fendant in a lineup which occurred eight months after the crime and in which the defendant was the only bald man with a facial scar, there was no error, in the totality of the circumstances, in admitting the witness's in-court identification of the defendant. [311-313]

At a criminal trial there was no error in permitting a question calling for identification, which the defendant on appeal claimed was multifarious, leading and confusing, where the defendant's objection to the question at the trial was based solely and specifically on due process grounds and where in the context of the examination of the witness the meaning of the question should have been clear. [313]

At the trial of indictments charging murder and sexual assault on a young girl evidence that the victim was last seen alive in the company of the defendant and that substantial bleeding accompanied the sexual assault, and expert testimony from which the jury could infer that certain hairs found in the interior of the clothing of the victim had been forcibly removed from the defendant's head and pubic area warranted a finding that the victim was alive at the time of the sexual attack. [313-315]

If a murder and a rape, or attempted rape, form part of a continuous transaction, the killing constitutes murder in the first degree regardless whether the victim was alive or dead at the time of sexual molestation. [315-317]

At the trial of indictments charging crimes related to sexual abuse of a child there was no error in the admission of six black and white photographs of the victim's body. [317-318]

Where a criminal case was tried before the decision of this court in *Commonwealth* v. *Stewart*, 365 Mass. 99 (1974), and the defendant failed to show a particularized need for inspection of the grand jury testimony of a witness, there was no error in denying the defendant's motion for a copy of the transcript of this testimony. [318]

At the trial of a criminal case in which it was clear beyond dispute that a homicide was involved, error, if any, in the admission of a death certificate, containing the specification that the victim's death was a homicide, was harmless. [318-319]

Imposition of the death penalty on a defendant convicted of murder committed in the course of a sexual assault on a child violated the State Constitution. [319] TAURO, C.J., concurring; QUIRICO, J., dissenting.

INDICTMENTS found and returned in the Superior Court on October 12, 1971.

The cases were tried before *Roy*, J.

*John P. White, Jr.,* for the defendant.

*Thomas F. Reardon,* Assistant District Attorney *(Sandra L. Hamlin,* Assistant District Attorney, with him) for the Commonwealth.

HENNESSEY, J. The defendant was tried before a Superior Court judge with jury on indictments charging him with the crimes of murder, kidnapping, indecent assault and battery on a child under the age of fourteen, and carnal knowledge and abuse of a female child, one Theresa, a six-year old girl. He was found guilty as to all the indictments after a trial subject to G. L. c. 278, §§ 33A-33G. He was sentenced to death on the charge of murder in the first degree;[1] to life imprisonment on the charge of carnal abuse (to be served from and after the sentence imposed on the murder charge); and to terms of years as to the other two indictments (to be served consecutively from and after the sentences previously imposed). The case is before us on the defendant's assignments of alleged error by the trial judge.

The defendant argues that there was error in the denial of his motion to suppress from evidence certain hair samples taken from him after his arrest; in the admission in evidence of photographs, allegedly inflammatory, of the body of the deceased child; in the denial of his motion to strike certain expert testimony concerning microscopic comparison of hair samples of the defendant with hair removed from the clothing of the decedent; in the admission in evidence of a death certificate containing the word "homicide"; in the introduction of in-court identification testimony, allegedly constitutionally impermissible, by the ten-year old brother of Theresa; in the denial of his motion to inspect grand jury minutes; in the denial of his motions for directed verdicts of not guilty as to the charges of indecent assault and battery on a child under fourteen and carnal abuse of a female child; and in the

---

[1] The trial was held before the date of *Furman* v. *Georgia,* 408 U.S. 238 (1972). As to the applicability of the *Furman* principle to this case, see n.6, *infra.*

imposition of the death penalty, contrary to the principles of the Federal and State Constitutions.

There was evidence that Theresa went to see a movie at the Roxbury Cinema on April 26, 1970, accompanied by her brother Richard, who was then eight years old, and her brother Michael, who was then ten years old. The children left the theatre about 4 P.M. and events occurred thereafter, as fully described, *infra*, culminating in the disappearance and death of Theresa.

We conclude that there was no error, except in the imposition of the death penalty, and that the judgments are to be affirmed as modified to require the imposition of a sentence of life imprisonment in lieu of the sentence of death.

1. Samples of the defendant's hair were snipped from his head, chest, and pubic area. The defendant's motion to suppress these samples was denied by the trial judge after an evidentiary hearing. The samples, together with expert testimony concerning comparison with hair taken from the clothing of the victim, were admitted in evidence. The defendant, correctly we believe, does not contend that there is any violation of the Fifth Amendment or Sixth Amendment to the United States Constitution. Rather, he makes the argument that the hair samples were taken from him in violation of the Fourth Amendment in that an unreasonable search and seizure were involved. See *Schmerber* v. *California*, 384 U.S. 757, 766-772 (1966). There was no error.

The judge made findings of fact at the hearing on the motion to suppress the hair samples. He found, in part, that the crimes involved in the instant indictments occurred on April 26, 1970, and that Officer Daley of the Boston police department, homicide unit, on April 27, 1970, received detailed descriptions of the assailant from Theresa's two brothers.[2] Officer Daley at that time (April 27, 1970) was also aware of the fact that a sexual

---

[2] These detailed descriptions are included, *infra*, at 308, 311-313.

assault had been made against a young girl named Nadene on February 8, 1970. That assault took place in the same neighborhood from which Theresa had disappeared. The descriptions of the assailant in both cases were such that the police were of opinion that the assailant was the same in both cases, and further that the assailant was the defendant, Frank Tarver. Indictments in the case involving Nadene were returned against the defendant on the first Monday of November, 1970.

Late in November, 1970, the Boston police learned that the defendant was being held in custody in north Las Vegas, Nevada, on an unrelated charge. Officers Daley and O'Malley went to Las Vegas, and rendition proceedings were then commenced for the return of the defendant to Massachusetts. As a result of these proceedings, the defendant was brought back to Boston in the custody of the officers. The hair samples were taken promptly on his arrival at a Boston police station, in what we conclude was a valid search incident to a lawful arrest. The warrant on which the rendition was based arose out of the indictments concerning Nadene. No indictments or complaints relating to the crimes against Theresa had as yet been returned when the hair samples were taken. The hair samples were in no way related to the investigation of Nadene's case.

We accept as true the defendant's statement of a basic principle deriving from the Fourth Amendment, that as a rule, but with certain recognized exceptions to the rule, any search or seizure which is accomplished without a valid warrant is unreasonable and therefore unlawful. See *Katz* v. *United States*, 389 U.S. 347, 357 (1967). The defendant also emphasizes, in urging that the search and seizure here were unreasonable, that the hair samples were taken when the defendant was under arrest for an unrelated crime, was without counsel, and was a prime suspect in the crimes involving Theresa.

The burden of establishing reasonableness was on the Commonwealth (*Chimel* v. *California*, 395 U.S. 752,

762 [1969]; *Commonwealth* v. *Antobenedetto,* 366 Mass. 51, 57 [1974]), and we believe that burden was sustained. We rely generally on the reasoning that a search incident to a lawful arrest may be valid even though accomplished without a warrant. Essentially, the defendant's argument is that the search and seizure were related to the case involving Theresa, and he was not under arrest for the crimes against her. Nevertheless, we conclude that the hair samples were properly taken in a search incident to arrest.

We recognize that the same Fourth Amendment standards of probable cause are applicable to arrests as well as to searches. *Giordenello* v. *United States,* 357 U.S. 480, 485-486 (1958). In *Davis* v. *Mississippi,* 394 U.S. 721 (1969), where the defendant was briefly detained by the police for questioning, without probable cause, evidence of his fingerprints obtained during the detention was excluded as the fruit of an unlawful arrest. "Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" *Id.* at 726-727. Compare *Commonwealth* v. *Bumpus,* 362 Mass. 672, 674-677 (1972), judgment vacated and remanded on other grounds, 411 U.S. 945 (1973), affd. on rehearing 365 Mass. 66 (1974), (where this court said that evidence obtained involuntarily from a suspect not under arrest was admissible, since the evidence was procured under a court order issued after a hearing in which probable cause for arrest of the suspect was shown), with McGowan, Constitutional Interpretation and Criminal Identification, 12 William & Mary L. Rev. 235, 242-247 (1970).

The Commonwealth argues that a search has been upheld even where the suspect was not under arrest (as in *Cupp* v. *Murphy,* 412 U.S. 291 [1973], where a search for fingernail scrapings was upheld even though there was no formal arrest). We do not consider the *Cupp*

case, or *Schmerber* v. *California*, 384 U.S. 757 (1966) (where a blood sample was taken to test for alcoholic content), as entirely apposite, because of the exigency aspect present in those cases, i.e., the likelihood of imminent loss of the evidence. Rather, we prefer to rest our reasoning on the fact that the defendant was under valid arrest as to Nadene's case, and but for that fact could just as appropriately be under arrest as to Theresa's case, or as to both cases.

Of primary importance is our conclusion that the police had probable cause to believe, at the time they took the hair samples, that the defendant was guilty of the kidnapping and murder of Theresa. Thus, although the defendant was not under arrest for those crimes and indeed no complaint had issued against him as to those crimes, the police were not engaged in a catchall or random proceeding in hopes of involving the defendant in as yet unknown crimes; rather they were purposefully pursuing the investigation of specific crimes as to which strong evidence against the defendant was known to them. Cf. *Terry* v. *Ohio*, 392 U.S. 1, 30 (1968).

Probable cause was made out by an unusually detailed description provided to the police by Theresa's two brothers at the time of her disappearance. They described the man who asked them to buy Pall Mall cigarettes in a nearby store, and who was with Theresa when they last saw her as they entered the store. Their description correlated in remarkable detail with the appearance and characteristics of the defendant as the police observed him when they took him in custody in north Las Vegas. There was even further corroboration when the police considered other evidence as to the defendant's appearance, as stated by friends and relatives, on the day of Theresa's disappearance.

As of the time of the taking of the hair samples, some of the known facts which tended to relate the defendant to Theresa's case were that the defendant resided in the precise neighborhood from which Theresa disappeared;

that he left Boston for north Las Vegas within a few days after she disappeared, and (at the very least) failed to return to Boston or notify authorities when he became aware that he was being sought in connection with Theresa's case; that he sometimes smoked Pall Mall cigarettes; that he met the description of the suspect sought in a recent sexual assault on a young girl in the same neighborhood from which Theresa disappeared; that he met the description supplied by her two brothers with respect to his hairline, a scar near his right eye, his height, a small goatee, a limp in one leg, and other particulars.

Thus the existence of probable cause as to Theresa's case is important to our conclusion that the search and seizure here were not unreasonable. It is not crucial that the defendant was not under arrest for the crimes against Theresa, since it seems clear (from specific police testimony) that the police would have proceeded just as aggressively to procure his arrest in Theresa's case if he were not already in custody on a warrant in Nadene's case. Further, the search and seizure were made promptly on the defendant's arrival in custody in Boston. Compare *Stoner* v. *California*, 376 U.S. 483, 486-487 (1964), with *United States* v. *Edwards*, 415 U.S. 800, 810 (1974) (Stewart, J., dissenting).

If the hair samples had been relevant as to Nadene's case there is no doubt that the search would be valid as routinely incident to a lawful arrest, just as an identifying procedure such as fingerprinting would be appropriate. It would not be supportive of the true purposes of the Fourth Amendment for this court to hold that the search was unreasonable merely because the arrest was made in the name of Nadene's case, since there was simultaneously known to the arresting police at least equally strong evidence implicating the defendant in Theresa's case.

In concluding that the taking of the hair samples was not unreasonable within the meaning of the Fourth Amendment, we consider, in addition to the existence of

probable cause, that the taking of the hair samples was not an unreasonable bodily intrusion, if it was a bodily intrusion at all. *United States* v. *D'Amico*, 408 F.2d 331, 333 (2d Cir. 1969) (head hair). *Brent* v. *White*, 398 F.2d 503, 505 (5th Cir. 1968), cert. den. 393 U.S. 1123 (1969) (scraping of penis held not an intrusion of the body surface). See *United States* v. *Cox*, 428 F.2d 683, 687-688 (7th Cir. 1970), cert. den. 400 U.S. 881 (1970) (head hair). See also *United States* v. *Edwards*, 415 U.S. 800, 802 (1974) (clothing); *United States* v. *Mara*, 410 U.S. 19, 22 (1973) (handwriting exemplars); *United States* v. *Dionisio*, 410 U.S. 1, 14 (1973) (voice exemplars). Cf. *People* v. *Bracamonte*, 15 Cal. 3d 394, 404-405 (1975) (forced ingestion of emetic solution held violative of the Fourth Amendment); *Rochin* v. *California*, 342 U.S. 165 (1952).

2. The defendant also argues that certain expert testimony concerning the hair samples of the defendant should not have been received in evidence. This testimony resulted from microscopic comparison of the hair samples with hair taken from and near the victim's body. The thrust of the defense argument is that the analysis was not such as to permit identification of the hair found on and near the body; concededly the expert at best could have eliminated the defendant as a suspect, if that result had conformed to the facts.

The qualifications and competence of the witness to testify were, as in most cases, to be decided in the discretion of the trial judge. *Commonwealth* v. *Devlin*, 365 Mass. 149, 152 (1974), and cases cited. It was sufficiently shown in the record that the use of microscopic examination has been generally accepted by the community of scientists involved. See *Commonwealth* v. *Fatalo*, 346 Mass. 266, 269 (1963); *Commonwealth* v. *Lykus*, 367 Mass. 191, 204 (1975). The expert opinions were relevant; it was sufficient that the opinions served, if accepted by the jury, to exclude large classes of persons from consideration as the source of the hairs found on

and near the victim's body. We find no merit in the contention of the defendant that, because of the limited nature of the conclusions which the expert was willing to reach, the evidence should have been admitted only if it served to exclude the defendant from consideration. Nor can it be said that the trial judge was required to rule that only the technique of "Neutron Activation Analysis," now suggested by the defendant, would have been adequate in this case. There is nothing properly before us to show that this technique is scientifically acceptable; even if this process were established as acceptable it is improbable that we would for that reason conclude that the more limited studies and opinions of the expert here were not admissible.

3. The defendant argues that the in-court identification of the defendant by the witness Richard, a brother of Theresa, was impermissibly tainted and should have been excluded. The defendant emphasizes that a period of eight months elapsed between the date of the offense and the date the witness viewed a lineup,[3] at which he stated that the defendant "look[ed] like" the man he had observed in the company of his sister on the day she disappeared. In the interim, photographs of other men had been shown to him, and on one occasion he had picked out the defendant from photographs of two men shown to him. Further, the suggestion is that the questions put to the witness which led to the in-court identification were leading and confusing.

We of course examine the totality of circumstances to ascertain whether the in-court identification was tainted by proceedings "so unnecessarily suggestive and conducive to irreparable mistaken identification that . . . [the

---

[3] There is nothing to show that the lineup was tainted in its composition, nor is it urged here that the defendant's constitutional rights were violated because the lineup was viewed by persons not interested in the specific crime for which he was under arrest. See, e.g., *United States* v. *Perry*, 504 F.2d 180, 182-184 (D.C. Cir. 1974) (separate statement by McGowan, J.).

accused] was denied due process of law." *Stovall* v. *Denno,* 388 U.S. 293, 302 (1967). *Kirby* v. *Illinois,* 406 U.S. 682, 691 (1972). *Neil* v. *Biggers,* 409 U.S. 188, 196 (1972).[4] In light of this *totality,* and despite the defendant's emphasis on some (only) of the relevant factors, we conclude that there was no prohibition, constitutional or otherwise, against the admission of the identification testimony.

We consider the due process question with the principles of *United States* v. *Wade,* 388 U.S. 218, 241 (1967), in mind.[5] We recognize that eight months elapsed between the time of the offense and the lineup confrontation, and that this is an important negative factor. *Neil* v. *Biggers,* 409 U.S. at 201 (1972). So also are the facts that the witness Richard was only eight years old at the time of the offenses and ten years old at the time of the trial, and that there was evidence that the defendant was the only bald man, with a facial scar, in the lineup. This falls far short of establishing that the lineup was tainted. Even assuming that the pre-trial confrontation was suggestive, all criteria considered together support the judge's ruling allowing the in-court identification before the jury. Richard had observed the defendant in good lighting conditions for more than a minute and a half under circumstances (the disappearance of his sister) which very soon thereafter almost certainly tended to

---

[4] Undoubtedly because the lineup preceded the complaint or indictment as to Theresa's case, no issue as to the absence of counsel at the pre-trial lineup is raised. As a consequence, no problem of exclusion per se of evidence of the pre-trial confrontation is involved, and the defendant rightfully addresses the due process issue as to all identification evidence. See *Neil* v. *Biggers,* 409 U.S. at 193.

[5] The *Wade* case listed six pertinent inquiries: (1) the extent of a witness's opportunity to observe the defendant at the time of the crime; prior errors, if any, (2) in description, (3) in identifying another person or (4) in failing to identify the defendant; (5) the receipt of other suggestions, and (6) the lapse of time between the crime and the identification.

impress the events on the boy's mind; he immediately gave a detailed description to the police and this description later proved to correlate remarkably with the defendant's appearance; he never wavered in that description; he identified the defendant in the confrontation at the lineup (where he said the defendant "look[ed] like" the man he had seen); he never failed to identify the defendant on any occasion where such an identification was possible; and he never identified any other person as the man he had seen, although he confronted a number of other men as possible suspects, and viewed pictures of others.

The defendant further objects to the form of the in-court identification evidence, contending that the ultimate question calling for identification was multifarious, leading and confusing to the witness and the jury. It is urged that the question be considered in light of the fact that the witness was only ten years old. First of all, we note that the defendant's objection at the trial to the question now in issue was specifically and solely based, not on the form of the question, as now argued, but on due process grounds. Furthermore, we conclude that the meaning of the question, as heard in the context of the examination of the witness, should have been clear to the witness and the jury. In particular the question followed a series of answers in which the witness had told the jury that he had identified a man in the lineup who "look[ed] like" the man who was present when Theresa disappeared. The question and answer, particularly in light of the stated ground of the defendant's objection, were properly admitted in the judge's discretion. See *Commonwealth* v. *Harrison*, 342 Mass. 279, 286 (1961).

4. The defendant argues that it was error for the judge to deny the defendant's motions for directed verdicts on two of the indictments charging, respectively, indecent assault and battery on a child under the age of fourteen and carnal knowledge and abuse of a female child. The defendant contends that the evidence is conjectural as to

one necessary element of these crimes, in that the evidence does not warrant a conclusion that the victim was alive when sexual molestation took place.

Implied in the defendant's argument is the further contention that if he was entitled to a directed verdict on the carnal abuse indictment, he would also be entitled to a new trial on the conviction of murder in the first degree. This follows because the judge in his charge to the jury permitted consideration, as one premise for a verdict of murder in the first degree, a murder committed "in the commission or attempted commission of a crime punishable with death or imprisonment for life." G. L. c. 265, § 1. He further instructed that carnal abuse of a female child was such a crime. G. L. c. 265, § 23. It seems clear that the jury, since they concluded that the defendant was guilty as to all indictments, reached their verdict of murder in the first degree based on a conclusion that the defendant raped or attempted to rape the victim. They may well also, of course, have based their conclusion as to murder in the first degree on the additional ground of extreme atrocity and cruelty or deliberate premeditation, or both of these premises, since the judge in his charge treated these as permissible reasoning.[6]

---

[6] The trial was held before the date of *Furman* v. *Georgia*, 408 U.S. 238 (June 29, 1972). The judge correctly (as of that time) charged the jury as to their function in recommending that the death penalty not be imposed if they concluded that the defendant was guilty of murder with deliberate premeditation, or with extreme atrocity and cruelty, or with both elements. *Furman*, of course, proscribes death sentences rendered in that way. The judge also correctly charged that if the jury found Tarver guilty of murder in the commission of a rape or attempted rape, they could make no recommendation of mercy. Therefore, if we had not held in *Commonwealth* v. *O'Neal, ante,* 242 (1975) (*O'Neal II*), that even the mandatory death penalty applicable to rape-murder is unconstitutional under our State Constitution, it seems clear that this court might well have been constrained to affirm the death penalty in this case. This follows from necessary inferences to be drawn by reason of the jury's returning verdicts of guilty of both rape and murder in the first degree.

We believe that the evidence warranted a conclusion that Theresa was alive at the time of the sexual attack. It is true that the only medical expert who testified stated that Theresa was probably unconscious or dead at the time. However, there was other evidence which was supportive of the inference that she was alive. It was shown that she was last seen alive in the company of the defendant; substantial bleeding accompanied the sexual assault; most important, from expert testimony the jury could properly infer that certain hairs found in the interior of the clothing of the victim had been forcibly removed from the defendant's head and pubic area. The jury could also consider this evidence in light of reasoning that the killing was for the purpose of concealing the rape and was done during the rape. See *Commonwealth* v. *Osman*, 284 Mass. 421, 425 (1933).

We conclude also that, as to murder in the first degree, we should base the result on a second ground. We hold, for the first time in this Commonwealth, with reference to the murder indictment, that it is inconsequential in a case of this kind that the death of the victim preceded the sexual attack.[7] Other courts have so held. See *People* v. *Quicke*, 61 Cal. 2d 155, 158-159 (1964); *People* v. *Goodridge*, 70 Cal. 2d 824, 838 (1969); *People* v. *Stanworth*, 11 Cal. 3d 588, 604-605 n.15 (1974); *State* v. *Whitfield*, 129 Wash. 134, 138-139 (1924). See also *People* v. *Tolbert*, 70 Cal. 2d 790, 801, 806 (1969), cert. den. 406 U.S. 971 (1972).

[7] All similar Massachusetts cases brought to our attention by the parties show that this specific issue has not been directly addressed since the court has invariably found that the evidence indicated that the victim was alive at the time of the sexual abuse. *Commonwealth* v. *Osman, supra. Commonwealth* v. *McGarty*, 323 Mass. 435, 439 (1948). *Commonwealth* v. *O'Neal*, 367 Mass. 440, 442-443 (1975) (*O'Neal I*). Nothing to the contrary can be found in *Commonwealth* v. *Costa*, 360 Mass. 177, 181 (1971), where there was no evidence that the sexual abuses perpetrated there took place before the victims' respective deaths. Therefore, although we are establishing the principle for the first time, we are not overruling any prior holdings of this court.

The test, it has been held in such cases, is whether the killing and the felony "occurred as part of one continuous transaction in which rape was involved. It is not necessary that the homicide occur while the rape is in progress nor that it be caused by the rape." *People* v. *Medina*, 41 Cal. App. 3d 438, 451 (1974). *Parson* v. *State*, 222 Atl. 2d 326, 332 (Del. 1966) (citing Anderson, Wharton's Criminal Law and Procedure § 252 [1957]), cert. den. 386 U.S. 935 (1967). See *Commonwealth* v. *Dellelo*, 349 Mass. 525, 529-530 (1965) (felony murder); *State* v. *Montgomery*, 191 Neb. 470, 473-474 (1974) (robbery and homicide); *State* v. *Craig*, 82 Wash. 2d 777, 781-782 (1973) (robbery and homicide), quoting from *State* v. *Whitfield, supra.*

The reasoning of these cases is convincing, particularly as stated in *State* v. *Whitfield, supra*: "The proof of the killing, together with the fact that it was committed in connection with a rape, is sufficient to constitute murder in the first degree. From the very nature of things — and the evidence in this case illustrates the situation as well as any case could — it is often impossible for the state to know at just what instant a killing was committed, whether it was done in the commission of a felony, or in attempting to commit a felony, or while withdrawing from the scene of a felony. The facts here show that there were blows on the head of the child which may have been inflicted before the rape took place, or after the rape had been committed, or may have been inflicted while the accused was withdrawing from the scene. The child's throat was also cut, and the same uncertainty exists as to when that mortal wound was inflicted. It is impossible to tell whether the wounds to the head or throat occasioned the death. Under such circumstances, to compel the state to make a choice as to the exact instant that an unwitnessed killing took place is, by a technicality, to embarrass justice."

In the *Whitfield* case and cases from other jurisdictions (see, e.g., cases cited in the three preceding paragraphs),

the rule was applied only as to murder convictions. There is emphasis in the *Whitfield* opinion at 139, for example, that "[the defendant] was charged with one crime and only one [first degree murder], and if the killing took place while the . . . [defendant] was concerned in a rape, it is immaterial if it was during the attempt, consummation or flight." Based on the same sound reasoning of some of these opinions we believe that our holding should at this time apply only to the murder indictment.

Accordingly, we hold that, in so far as the conviction of murder in the first degree is concerned, it is inconsequential whether the victim was alive or dead at the time of sexual molestation, so long as the rape, or attempted rape, and the murder were parts of a continuous transaction. It is indisputable in this case that the evidence warranted an inference that the crimes were part of a continuous transaction. It follows that, on this second and alternative reasoning, there was no error in submitting to the jury the indictment concerned with murder, and in charging the jury that a conviction of murder in the first degree would be warranted, among other grounds, if they found that the homicide was committed during a rape or attempted rape.

5. The defendant claims error in the admission of six black and white photographs of the body of Theresa in that they were so inflammatory in nature that they overrode any probative value. There was no error. The photographs had important evidential value, particularly in light of the Commonwealth's burden to prove crimes charged under the indictments related to sexual abuse of the child. *Commonwealth* v. *McGarty*, 323 Mass. 435, 438-439 (1948), and cases cited. *Commonwealth* v. *Pike*, 324 Mass. 335, 338 (1949), and cases cited. *Commonwealth* v. *Lee*, 324 Mass. 714, 718-719 (1949), and cases cited. *Commonwealth* v. *Lamoureux*, 348 Mass. 390, 392-393 (1965). *Commonwealth* v. *Stirling*, 351 Mass. 68, 72 (1966). *Commonwealth* v.

*Rogers*, 351 Mass. 522, 531, cert. den. 389 U.S. 991 (1967). *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 817 (1973).

6. The defendant asserts error in the judge's denial of his motion to be furnished with a copy of the transcript of the grand jury testimony of the witness Richard. This court, in conferring a right of access to grand jury testimony of Commonwealth witnesses relating to the subject matter of their testimony at trial without a showing of a particularized need, ordered that the new rule would be applied prospectively only. *Commonwealth* v. *Stewart*, 365 Mass. 99, 105-106 (1974).

The burden in the instant case, which was tried before the date of the *Stewart* decision, is thus on the defendant to show a particularized need. *Commonwealth* v. *Ladetto*, 349 Mass. 237, 244-245 (1965). *Commonwealth* v. *Doherty*, 353 Mass. 197, 209-210 (1967), cert. den. 390 U.S. 982 (1968). *Commonwealth* v. *Gordon*, 356 Mass. 598, 602-603 (1970). The defendant in substance argues that the record shows evidence of particularized need so compelling as to demonstrate error in the judge's ruling adverse to the defendant's motion. We disagree. There is nothing before us to demonstrate error in the ruling of the judge (who examined the grand jury transcript in camera) that the record showed no inconsistency with the witness's testimony at the trial. See *Commonwealth* v. *Stewart*, 365 Mass. at 104. Although it is clear that appellate counsel has examined the grand jury record, the defendant's argument in this regard is neither specific nor well focused. Particularized need was not demonstrated before the trial judge, or before this court. See generally *Pittsburgh Plate Glass Co.* v. *United States*, 360 U.S. 395, 400 (1959).

7. The defendant contends that it was error to permit the introduction of a death certificate concerning Theresa which contained the specification by the medical examiner that the death was a "homicide." In *Commonwealth* v. *Lannon*, 364 Mass. 480, 485 (1974), we sug-

gested that it might be error to permit such an entry to come to the attention of the jury. However, an issue in that case was whether the death was accidental or a homicide. In the case before us, it is clear beyond dispute that a homicide was involved. Assuming error in the admission in evidence of the entry in the certificate, the error was clearly harmless.

8. The defendant challenges the constitutionality of the death penalty imposed on him. This court has decided that the death penalty for rape-murder is proscribed by our State Constitution. *Commonwealth* v. *O'Neal, supra* at 243 (*O'Neal II*). Accordingly the death penalty imposed herein must be vacated.

9. There was no error except in the single particular of the death penalty. Accordingly, the murder indictment is remanded to the Superior Court where the sentence of death is to be vacated and a sentence of imprisonment for life is to be imposed. *Commonwealth* v. *LeBlanc*, 364 Mass. 1, 14-15 (1973).

After reviewing the entire evidence and proceedings in accordance with our function under G. L. c. 278, § 33E, we see no reason for disturbing the verdict in the murder case except for this modification of the sentence. As so modified, the judgments are affirmed.

*So ordered.*

TAURO, C. J. (concurring). Justice Quirico, speaking in dissent, states that the majority in this case as well as in *O'Neal II* feel that "the General Court has somehow lost the constitutional power . . . to mandate, as matter of legislative judgment and policy, that the penalty for the crime of rape-murder shall be death," and concludes that he and Justices Reardon and Braucher "[adhere] to the position that under the Constitution of this Commonwealth the General Court still has . . . [this] power."

I am quite confident that Justice Quirico does not wish to leave the impression (as might be inferred) that in

rape-murder cases the Supreme Judicial Court has "somehow lost the . . . power" and responsibility, on review, to pass on the constitutionality of the statute in question — because this is all we have done, no more and no less. I am sure that even the most ardent advocate of the Legislature's prerogatives would not argue that legislative views on the constitutionality of *any* statute are final and not subject to review by this court.

Of course the General Court has the power and the duty to exercise "legislative judgment and policy." Such exercise of judgment and policy is entitled to the utmost respect by this court. Moreover, the Justices should never substitute their views on matters of judgment and policy for those of the Legislature. However, it always has been and still is our solemn constitutional and statutory obligation to make the ultimate decision on *constitutional* questions. This is precisely what the majority have done.

QUIRICO, J. (dissenting in part). The defendant was convicted of the crimes of murder in the first degree, kidnapping, indecent assault and battery on a child under the age of fourteen, and carnal knowledge and abuse of a female child. All four offenses arose out of the same incident and all were committed against the same victim. In part 4 of the court's opinion it is stated: "It seems clear that the jury, since they concluded that the defendant was guilty as to all indictments, reached their verdict of murder in the first degree based on a conclusion that the defendant raped or attempted to rape the victim."

Under G. L. c. 265, § 2, as amended through St. 1956, c. 731, § 12, as in effect at all times material to this case, the death penalty was mandatory for a person guilty of murder in the first degree "unless the jury shall by their verdict, and as a part thereof, upon and after consideration of all the evidence, recommend that the sentence of death be not imposed, in which case he shall be punished by imprisonment in the state prison for life." The jury

did not recommend that the sentence of death be not imposed, and indeed they could make no such recommendation in this case because § 2 provides further that "[n]o such recommendation shall be made by a jury or recorded by the court if the murder was committed in connection with the commission of rape or an attempt to commit rape." On this combination of facts and law, the trial judge, following the clear mandate of G. L. c. 265, § 2, sentenced the defendant to death on the conviction of murder. The several consecutive sentences imposed for the other crimes are not at issue in this dissent. All the sentences were imposed before the decision in the case of *Furman* v. *Georgia,* 408 U.S. 238, on June 29, 1972.

Despite the factual and statutory background described above, this court has this day held that the death penalty imposed on the defendant "must be vacated," and it has ordered that "the murder indictment is remanded to the Superior Court where the sentence of death is to be vacated and a sentence of imprisonment for life is to be imposed." The holding and order are preceded by the statement that the death penalty for the crime of rape-murder is proscribed by the Constitution of this Commonwealth, citing as authority therefor the decision in *Commonwealth* v. *O'Neal, ante,* 242, 243 (1975) (*O'Neal II*), decided this day. The relationship between the *O'Neal* decision and the order that the sentence of death in the present case be vacated is further indicated by the following statement in fn. 6 of the court's opinion in this case: "[I]f we had not held in . . . [the *O'Neal II* case], that even the mandatory death penalty applicable to rape-murder is unconstitutional under our State Constitution, it seems clear that this court might well have been constrained to affirm the death penalty in this case."

For all the reasons stated in the dissenting opinion of Reardon, J., which I joined, in the *O'Neal II* case, I also dissent from the action of the court in holding in this

case, as it did in the *O'Neal II* case, that in effect (a) the General Court has somehow lost the constitutional power which it has at all times heretofore possessed to mandate, as matter of legislative judgment and policy, that the penalty for the crime of rape-murder shall be death, and (b) the State Constitution which has at all times prior hereto permitted the General Court to mandate the death penalty for that crime now prohibits it from doing so.

In the *O'Neal II* case, four members of this court, Tauro, C.J., and Hennessey, Kaplan, and Wilkins, JJ., concluded that the General Court may no longer mandate the death penalty for the crime of rape-murder, basing their conclusions on one or more of several constitutional grounds, no one of which grounds had more than three adherents. A fifth member, Braucher, J., concurred in the result on a basis of statutory construction, but he did so after first stating that "[o]n the constitutional issues discussed in the opinions of my brothers, I find myself in agreement with the dissenting opinion of Justice Reardon." There were thus three members of the court, Reardon, Quirico, and Braucher, JJ., who, in *O'Neal II*, adhered to the position that under the Constitution of this Commonwealth the General Court still has the power which it has at all times heretofore possessed to mandate, as matter of legislative judgment and policy, that the penalty for the crime of rape-murder shall be death.