COMMONWEALTH *vs.* JOSEPH PANDOLFINO.

No. 91-P-1334.

Norfolk. March 12, 1992. - July 29, 1992.

Present: ARMSTRONG, DREBEN, & GREENBERG, JJ.

*Constitutional Law*, Assistance of counsel. *Search and Seizure*, Threshold police inquiry. *Identification. Evidence*, Statistics.

At the trial of a defendant charged with unarmed robbery and assault with intent to kidnap, defense counsel's performance did not fall below the constitutional standard of effectiveness by reason of failure to seek suppression of the victim's identification of the defendant on the ground that it was the product of an unlawful arrest, where the identification was made at a one-on-one showup during an investigatory stop of the defendant shortly after the crimes. [98-99]

At the trial of a defendant charged with unarmed robbery and assault with intent to kidnap, defense counsel's performance did not fall below the constitutional standard of effectiveness by reason of failure to object to, rebut, or move to strike incorrect statistical testimony of the Commonwealth's expert witness where the testimony apparently was unexpected by both counsel and the error was not obvious, where defense counsel's inaction may have had a basis in reasonable tactical judgment, and where the evidence against the defendant was so strong as to render unlikely any substantial risk of a miscarriage of justice. [99-103]

INDICTMENTS found and returned in the Superior Court Department on February 4, 1988.

A motion for a new trial, filed on May 31, 1991, was heard by *Robert W. Banks*, J.

*Charles W. Rankin* (*Margaret H. Carter* with him) for the defendant.

*James F. Lang*, Assistant District Attorney, for the Commonwealth.

ARMSTRONG, J. The defendant appeals from the denial of his motion for a new trial following his convictions of un-

armed robbery and assault with intent to kidnap.[1] The motion was based on ineffective assistance of trial counsel for his alleged mishandling of a motion to suppress and for allowing inaccurate and damaging statistical evidence to be considered by the jury.

The evidence most favorable to the Commonwealth was along these lines. The victim, a woman in her early twenties, was stopped at a red light in Wellesley Hills at 11:30 P.M. on January 12, 1988. A man wearing a short leather jacket and gloves, whose face was obscured by a ski mask, opened her car door and tried to enter, pushing her into the passenger seat. She struggled and escaped, and he drove off with her car. She ran into a business establishment and telephoned police who arrived immediately. Officer Komola broadcast a description of the perpetrator (5'10" white male, thinly built, early twenties, blue corduroy pants, ski mask, gloves)[2] and of her car. Officer Foley, driving a cruiser, spotted a car that seemed to answer the description, reversed direction to follow it, but concluded (without having a chance to see the registration plate) it could not be the right car when the driver left Route 9, entered a residential street, parked in a driveway, and got out and approached the house, as if to enter.

Officer Komola, meanwhile, left the victim with Lieutenant Whalen and proceeded to the parking lot of St. James Church on Route 9 to take up surveillance. About twenty to thirty minutes after the attack, he spotted the defendant walking on Route 9 and detained him because he matched the description given by the victim. The St. James Church lot was roughly one-half mile from the driveway where the car had been left. Officer Foley, notified that Officer Komola had detained a suspect, proceeded to St. James Church and identified the defendant as the person he had seen earlier driving the car that had left Route 9. Lieutenant Whalen

---

[1] He was also convicted of assault and battery, but the conviction was placed on file.

[2] The victim described the perpetrator as having a short dark leather jacket, but the transcript does not indicate whether the jacket was mentioned in the police broadcast.

then arrived at the church lot with the victim and her boy-friend. The victim identified the defendant as her attacker ("That's him . . . . I didn't see his face but that's him"). Officer Foley next took the victim to look at the car he had pursued earlier, and she identified it as hers. Inside was a ski mask. The defendant had gloves in his pocket. At trial a forensic chemist with the State Police Laboratory testified that he had examined hairs found in the ski mask and that they were identical in microscopic characteristics to one taken from the defendant.

1. The defendant's trial counsel filed a motion to suppress the victim's parking lot identification as the product of un-necessary suggestiveness by the police — the suggestiveness being that the defendant was (according to the victim's testimony and the judge's finding) handcuffed and standing between two officers (presumably Komola and Foley) when she viewed him in the lot. The motion was denied (compare *Commonwealth v. Harris*, 395 Mass. 296, 298-299 [1985]; *Commonwealth v. Williams*, 399 Mass. 60, 67-68 [1987]), and it is not now argued that the judge erred in denying the motion as so framed. Rather, the argument is that defense counsel· was deficient in failing to move for suppression on a different ground: namely, that the defendant had been arrested without probable cause and the identification was thus the product of an unlawful arrest. See and compare *Commonwealth v. Howell*, 394 Mass. 654, 656-659 (1985).

On the facts of this case, we are of opinion that the additional ground would have added nothing of substance to the motion. True, we lack a finding whether the defendant was or was not "under arrest"; the use of cuffs, if necessary to accomplish a permissible inquiry, does not convert a *Terry* stop[3] to an arrest. *United States v. Purry*, 545 F.2d 217, 220 (D.C. Cir. 1976). *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982), cert. denied, 459 U.S. 1211 (1983). *United States v. Taylor*, 716 F.2d 701, 708, 709 (9th Cir. 1983). *United States v. Kapperman*, 764 F.2d 786, 790 n.4

---

[3]*Terry v. Ohio*, 392 U.S. 1 (1968).

(11th Cir. 1985). See generally *Commonwealth v. Borges*, 395 Mass. 788, 792 n.3 (1985); *Commonwealth v. Crowley*, 29 Mass. App. Ct. 1, 4-5 n.6 (1990). The identification was not the product of an unlawful arrest if there was one; it was the product of the defendant's presence at the lot, which the police had a right, in this typical showup situation, to compel.[4] His status as a lawful *Terry* detainee or a possibly unlawful arrestee was causally irrelevant to the identification. Cf. *Commonwealth v. Tarver*, 369 Mass. 302, 307-310 (1975). So far as the identification was concerned, the cuffs were material only as they bore on suggestiveness. The judge's conclusion that the identification was not the product of unnecessary suggestiveness is not in dispute.

2. Trial counsel is also faulted for (a) allowing the State police chemist to introduce damaging statistical evidence in the absence of proof that the statistical evidence was accepted in the scientific community[5]; (b) being unprepared to rebut the chemist's erroneous statistics; and (c) failing to object to the prosecutor's erroneous use of the statistics in his closing argument. The statistical testimony came in, however, without design, apparently catching both counsel by surprise. On direct examination, the prosecutor only elicited testimony to the effect that the hairs found in the ski mask

---

[4]Contrast the analysis grounded in *Wong Sun v. United States*, 371 U.S. 471, 487-488 (1963), turning on whether evidence obtained following an illegal arrest is the product of exploiting the primary illegality or of means sufficiently distinguishable to be purged of the primary taint. See, e.g., *Brown v. Illinois*, 422 U.S. 590 (1975)(inculpatory statements); *United States v. Crews*, 445 U.S. 463 (1980)(in-court identification); *Commonwealth v. Pietrass*, 392 Mass. 892 (1984)(lineup); *Commonwealth v. Crowe*, 21 Mass. App. Ct. 456, 461-465 (1986)(postarrest photographs and lineup). This analysis logically should not apply in the case of a lawful showup, shortly after the crimes, supported under traditional *Terry* analysis. Compare *Commonwealth v. Crowley*, 29 Mass. App. Ct. at 4-6.

[5]As to the necessity for such a showing, see *Commonwealth v. Kater*, 388 Mass. 519, 524-527 (1983), S.C., 394 Mass. 531 (1985), S.C., 409 Mass. 433 (1991); *Commonwealth v. Curnin*, 409 Mass. 218, 221-223 (1991); *Commonwealth v. Lanigan*, 413 Mass. 154, 159 (1992); *Commonwealth v. Hyatt*, 29 Mass. App. Ct. 140, 144 (1990), S.C., 409 Mass. 689, 692-693 (1991), all applying the test enunciated in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923).

were consistent in microscopic characteristics with the defendant's hair. Compare, *Commonwealth* v. *Tarver*, 369 Mass. at 310-311; *Commonwealth* v. *Murray*, 17 Mass. App. Ct. 986 (1984); *Commonwealth* v. *Hyatt*, 29 Mass. App. Ct. 140, 144 (1990), *S.C.*, 409 Mass. 689 (1991). On cross-examination, defense counsel asked whether the hairs from the ski mask could be similar to those of a number of other people. The chemist's reply, going beyond what the question called for, was, "I believe statistics state one in 40,000." Defense counsel then asked whether the hairs could be similar to those of other people in the Boston area. The chemist answered, "As I said, statistics, one in 40,000. If there are more than 40,000 in the Boston area, I would say yes." In closing argument, the prosecutor compounded the problem by extrapolating: "[I]f you wanted two people to have the exact hair, it would be 80,000 people. You would have to go to 80,000 people before you found two people where the hair was the same as far as color and weight and characteristics and medulla, and so forth, and so on."

Affidavits filed in support of the defendant's motion for a new trial indicate that the statistic was based on a Canadian study reported in Gaudette & Keeping, "An Attempt of Determining Probabilities in Human Scalp Hair Comparison," 19 J. Forensic Sci. 599 (1974), and that the figure supported by that study is not one in 40,000 but one in 4,500. Apart from that erroneous starting point, the chemist's calculation that one would have to examine 40,000 random persons to find a hair match, and, a fortiori, the prosecutor's calculation of 80,000, both involved mathematical error. See the mathematical appendix in *People* v. *Collins*, 68 Cal. 2d 319, 333-335 (1968).[6]

---

[6]In *People* v. *Collins*, the perpetrator of a handbag snatch had been described by witnesses as a Caucasian female with a blond ponytail. One witness saw her jump into a yellow getaway car driven by a black male with a mustache and beard. The defendant was a black male with the described facial hair, who owned a yellow Lincoln, and whose wife was a Caucasian with a blond ponytail. Shaky identification testimony was augmented by the testimony of a mathematics teacher who posited the individual probabilities of each of the points of similarity (i.e., yellow automo-

Having in mind that ineffective assistance of counsel involves a showing of "serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer," *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), we see no deficiency in trial counsel's performance here that descends to that level. The exchange with the chemist did not work out advantageously for the defense; but counsel had no reason to expect the statistical evidence that came in, much less to be familiar with the Gaudette and Keeping study or with the published literature contesting its methodology.[7] The error in reciting the statistic was unfortunate; but ordinary, fallible counsel, having no reason to expect statistical evidence, could not be expected to have personal familiarity with scientific literature enabling him to spot the error. And counsel might, as a reasonable tactical judgment, decline to move to strike damaging testimony (for unresponsiveness, perhaps, or lack of foundation) after the jury has heard it, or move for a continuance, so as to avoid

---

bile, 1/10; female with ponytail, 1/10; female with blonde hair, 1/3; interracial couple in car, 1/1,000; man with moustache, 1/4; black man with beard, 1/10) and, applying a principle called the "product rule," calculated that only one couple in 12,000,000 would match the description of the perpetrators on all six points. The conviction was reversed on appeal. The foundational and mathematical errors are discussed in Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv. L. Rev. 1329, 1335-1337 (1971).

[7]See Giannelli & Imwinkelreid, Scientific Evidence § 24-2, at 1033 (1986); Barnett & Ogle, Probabilities and Human Hair Comparison, 27 J. Forensic Sci. 272 (1982). See also Lee & DeForest, Forensic Hair Examination, appearing in Wecht, Forensic Sciences § 37A.05[f] (1991), at 37A-38, which indicates that the Gaudette and Keeping figure is an average probability, which "cannot be applied directly to a particular case." In *Commonwealth* v. *Hyatt,* 29 Mass. App. Ct. at 144, the statistic (one chance in 4,500) from the Gaudette and Keeping study had been found by the trial judge to be "generally accepted by the scientific community" with no indication that defense counsel had brought contrary literature to the attention of the court. On further appellate review, 409 Mass. 689, the Supreme Judicial Court noted the issue concerning the statistical evidence and suggested that, on retrial, the court be guided by *Commonwealth* v. *Curnin,* 409 Mass. 218 (1991), which disapproved use of similar statistics relative to DNA testing. See also *Commonwealth* v. *Kater,* 382 Mass. 519, 524-527 (1983).

giving it emphasis. Compare *Commonwealth* v. *Williams*, 25 Mass. App. Ct. 210, 214-215 (1987).

Neither the admission of the statistical evidence nor the fact that it was demonstrably false would entitle the defendant to a new trial if that evidence has not created a substantial risk of a miscarriage of justice. On balance we think that no such risk exists here. The defendant was found near the scene of the crime and near the place where the perpetrator had left the victim's car shortly after the crime occurred, at 11:30 P.M. on a January night. He was evasive as to his presence (he claimed to have been hitchhiking to Milford, west of Wellesley, but was walking on the eastbound side of the highway when arrested). His clothing matched the description given by the victim. He had scratch marks on his face, consistent with the victim's account of her struggle with the attacker. He was identified with no uncertainty by the victim, who, concededly, had not seen his face, but had been specific as to coat, pants, mask, gloves, build, and color of skin. He was identified by Officer Foley as the person he had seen driving the victim's car immediately after the crime. (Officer Foley *had* seen his face, albeit briefly.) His hair was consistent with the samples taken from the ski mask the perpetrator had left in the victim's car. This evidence, cumulatively, pointed to a strong, if not overwhelming showing that the defendant was in fact the perpetrator. In this situation we think that the statistical significance of the hair match had little effect on the trial's outcome.[8] Compare *Common-*

---

[8]Contrast *People* v. *Collins*, see note 6, *supra*, where the independent identification was gravely impeached (the victim could not make an identification, and the only other witness had been unable at first to identify the defendant in a lineup), and the statistical evidence became the principal connecting link between the defendant and the attacker. If the statistical evidence is admissible on an adequate foundation (but see *Commonwealth* v. *Hyatt*, discussed in note 7, *supra*), both the correct figure (one in 4,500) and the mistaken figure (one in 40,000) are sufficiently definitive that the difference, although large mathematically, could be regarded as probatively inconsequential in a case (such as this) where the statistical evidence is merely corroborative of an independently supported identification of the perpetrator.

*wealth* v. *Drayton*, 386 Mass. 39, 49-51 (1982). Contrast *United States* v. *Massey*, 594 F.2d 676 (8th Cir. 1979).[9]

3. We have considered the other arguments pressed by the defendant. These are without merit, including the argument based on what seemed to be the start of an improper appeal to emotion. This was deflected by objections of defense counsel and a colloquy at the bench, after which the prosecutor took up a new and proper line of argument.

*Order denying motion for new trial affirmed.*

---

[9]In *United States* v. *Massey*, a divided court reversed a conviction in a situation where, without the evidence relating to hair samples in a ski mask, the evidence of the defendant's involvement was insufficient to warrant submission to the jury, 594 F.2d at 678-679, and the statistical evidence, lacking a foundation, was of "obvious importance" to the conviction. *Id.* at 681.