COMMONWEALTH vs. JAMES M. KATER.

Middlesex. December 3, 1990. - March 4, 1991.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Hypnosis. Evidence*, Hypnotically aided testimony, Identification, Recent
contrivance. *Homicide. Practice, Criminal*, Grand jury proceedings.
*Constitutional Law*, Confrontation of witnesses. *Identification.*

Where the record of a criminal trial was not adequate to support a ruling,
based on a fair preponderance of the evidence, that certain prosecution
witnesses' identifications of the defendant and his automobile were
based on what the witnesses remembered before they had been sub-
jected to hypnosis, a new trial of the indictments was required. [437-
441]

Statement of the procedures by which the judge at the retrial of a criminal
case was to determine whether the proffered identification testimony of
certain prosecution witnesses, who had been subjected to hyponosis, was
based on the witnesses' prehypnotic memory. [441-443]

At the trial of indictments for murder and kidnapping, the judge correctly
denied the defendant's motions for required findings of not guilty. [443-
445]

A criminal defendant who did not submit to this court the minutes of pro-
ceedings of the grand jury that indicted him thereby waived any objec-
tion to the indictments based on defects in those proceedings. [445]

A criminal defendant's right to confront the witnesses against him, secured
by art. 12 of the Massachusetts Declaration of Rights, was not in-
fringed by the judge's refusal to order a prosecution witness to look at
the defendant in the courtroom. [445-446]

A composite likeness prepared by a prosecution witness, of an individual
she had observed near the location from which a murder victim had
disappeared, which the witness refused to acknowledge at trial, was
properly admitted in evidence for impeachment purposes only; the de-
fendant was not entitled to have the jury consider it for substantive
purposes as evidence of a prior identification. [446-447]

If, at a criminal trial, the judge determined that a claim of recent contri-
vance had been raised with respect to the testimony of a prosecution
witness who had been subjected to hypnosis, the Commonwealth would
be entitled to introduce statements by the witness prior to hypnosis to
rebut the claim. [447-448]

INDICTMENTS found and returned in the Superior Court Department on November 28, 1978.

A pretrial motion to suppress evidence was heard by *Robert S. Prince*, J., and was reported by him. After review by the Supreme Judicial Court reported in 394 Mass. 531 (1985), the cases were tried before *Prince*, J.

*Jonathan Shapiro* (*Patricia Garin* with him)· for the defendant.

*Elspeth B. Cypher*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. We address for the third time the Commonwealth's prosecution of James M. Kater for the murder of Mary Lou Arruda. The defendant was convicted of murder in the first degree and kidnapping in 1979. In 1983, we reversed those convictions and remanded the case because the prosecution had introduced hypnotically-aided testimony. *Commonwealth* v. *Kater*, 388 Mass. 519 (1983) (*Kater I*). Preliminary to a retrial, an evidentiary hearing was held on the defendant's motion to suppress all testimony of the witnesses who had been hypnotized. After hearing part of the evidence, the trial judge concluded that it was not his function to determine the extent of a witness's prehypnotic memory and denied the defendant's motion to suppress. He reported the case to the Appeals Court, and we allowed the defendant's application for direct appellate review. We held that the judge should not have terminated the evidentiary hearing. Rather, he was required to resolve the issue of admissibility by separating admissible testimony based on prehypnotic memory from inadmissible testimony as to facts remembered only after hypnosis. We remanded the case for further proceedings. *Commonwealth* v. *Kater*, 394 Mass. 531 (1985) (*Kater II*). The suppression hearing was completed and the defendant was again tried for the murder in the first degree and kidnapping of Mary Lou. He was convicted in 1986. He now appeals, claiming that the trial judge did not properly follow the mandates of *Kater I* and *Kater II*. The defendant claims that the judge allowed testimony at the retrial which had not been shown to be based on the witnesses'

prehypnotic memory. We agree that the judge erred in his application of our rules concerning posthypnotic testimony, and therefore reverse these convictions and again remand the case for further proceedings.

The facts surrounding the disappearance and death of Mary Lou, which were adduced by the Commonwealth at the first trial, were set out in some detail in *Kater I, supra* at 522-523. The Commonwealth introduced substantially identical facts at retrial. We recite here only the facts relevant to the evidentiary issues before us, as the jury could properly have found them.

Mary Lou Arruda disappeared around four o'clock on the afternoon of September 8, 1978. She was last seen riding her bicycle on a road near her home only minutes before she disappeared. The last person to see Mary Lou was Helena McCoy, one of Mary Lou's school friends. McCoy was walking along Dean Street and noticed two automobiles, each of which passed her twice as she walked. One was a small, bright green compact driven by a man with dark curly hair and dark-rimmed glasses. The other was a dirty blue automobile driven by a young man with long brown hair, a light beard, and a baseball cap. As McCoy walked down Dean Street, she met Mary Lou, who was riding her bicycle in the opposite direction. The two girls chatted briefly, then continued in opposite directions.

Sheila Berry was driving along Dean Street when she observed a bright green compact automobile driven by a man with dark curly hair and dark-rimmed glasses. The green automobile pulled out onto Dean Street in front of Berry from the entrance to a pile of loam, and went down Dean Street very fast toward the opposite end of the street. She thought that there was some bulky object in the passenger's seat. Berry then proceeded down Dean Street.

At about the same time, Barbara Lizotte was driving on a cross street when she observed a small bright green automobile exiting Dean Street. She saw the driver do something on the passenger side of the car before the automobile passed

her going in the opposite direction. As she drove down Dean Street, she noticed a bicycle lying by the side of the road.

Albert Santos was the driver of the blue automobile on Dean Street. He saw a green automobile parked at the side of the road near one end of Dean Street. As he drove down the road and then back again, he observed both McCoy and Mary Lou on her bicycle. The green automobile was still parked by the side of the road when Santos left Dean Street.

Police officers interviewed McCoy and Berry in the days immediately following the disappearance of Mary Lou. Each described the green automobile and the driver in very similar terms. A police officer assisted each in preparing a composite likeness of the driver of the green automobile. McCoy also prepared a composite of the driver of the blue automobile. Police drove Berry and McCoy to various automobile lots to look for cars similar to the one they had seen on Dean Street. Neither Berry nor McCoy identified an automobile. McCoy and Berry then agreed to be hypnotized. A police officer hypnotized them and questioned them about the automobile and the driver they had seen on Dean Street. Approximately a week later McCoy and Berry were hypnotized again.

Lizotte did not talk to the police until several days after Mary Lou's disappearance. She described the green automobile and its driver, and participated with a police officer in preparing a composite likeness. She was then hypnotized and further questioned about what she had seen.

Santos contacted the police several days after the abduction. The composites prepared by McCoy of the drivers she had seen on Dean Street were published in the newspaper, and Santos recognized one of them as his own likeness. He gave a signed statement to police on September 12, 1978, detailing his activities and his observations of the green automobile he saw on Dean Street on September 8. He was later hypnotized and questioned further about his observations on Dean Street.

All four of these witnesses testified at the defendant's retrial. McCoy and Berry identified the defendant in court. Berry testified that a few weeks after the abduction, she had

identified the defendant's automobile and the defendant at the Brockton Dunkin' Donuts shop where he worked. Both Berry and McCoy testified that they had identified the defendant on other occasions prior to the retrial.

Berry and McCoy identified the defendant's automobile in court. They also testified that they had identified the defendant's automobile in a parking lot in Brockton on September 19, 1978. Santos identified the defendant's automobile in court and testified that he had identified it on prior occasions. Lizotte did not positively identify the defendant's automobile in court, but did testify that various features of that automobile were consistent with the automobile she saw on Dean Street.

1. *Testimony of the hypnotized witnesses.* The defendant claims that the trial judge should have excluded all of these identifications because the Commonwealth failed to meet its burden by proving that the identifications were untainted by hypnosis. We conclude that the evidence is not adequate to support a ruling that these identifications were based solely on the witnesses' prehypnotic memory.

In *Kater I*, we announced that "testimony by a witness as to a fact that became available following hypnosis is generally inadmissible in the trial of criminal cases in the Commonwealth. . . . Hypnosis simply lacks general acceptability by experts in the field as a reliable method of enhancing the memory of a witness."[1] *Id.* at 520-521. We made it clear, however, that "a witness may testify based on what he knew before hypnosis." *Id.* at 521.

We have applied the principle announced in *Kater I* on the inadmissibility of hypnotically-aided testimony to several cases in which a defendant sought to suppress the identification testimony of a witness who had been hypnotized. In a

---

[1] We noted in *Kater I* the possibility that a criminal defendant who had been hypnotized might have a constitutional right to testify to facts remembered after hypnosis. *Kater I, supra* at 528-529 n.6. It is now clear that a criminal defendant does have the right to testify to such facts. *Rock v. Arkansas*, 483 U.S. 44 (1987). The defendant's right to testify in his own defense is not implicated in this case.

case decided on the same day as *Kater I*, we considered it to be error to allow an in-court identification of the defendant and to admit evidence of a positive posthypnotic photographic identification when the witness's prehypnotic photographic identification was only eighty per cent certain. We noted that, although hypnosis had not produced any new evidence, it had altered the witness's certainty as to the identification. *Commonwealth* v. *Watson*, 388 Mass. 536 (1983) (the error was held to be nonprejudicial in the circumstances of the case). We have held it to be reversible error to allow identification testimony from a witness who gave a detailed description of her attacker before hypnosis, but was unable to identify a photograph of the defendant during hypnosis and made a positive identification of the photograph after hypnosis. *Commonwealth* v. *Brouillet*, 389 Mass. 605 (1983). We again held the admission of posthypnotic identification testimony to be reversible error where a witness gave inconsistent descriptions and was unable to develop composite likenesses before hypnosis, but could positively identify his attackers after hypnosis. *Commonwealth* v. *Dodge*, 391 Mass. 636 (1984). In none of these cases did we find it necessary to adopt a rule that a posthypnotic identification is admissible only if the witness has made a prehypnotic identification.[2] We decline to adopt an absolute prohibition of all posthypnotic identifications. We leave to another day whether we should adopt a rule excluding all posthypnotic identification or leave it to the discretion of the trial judge to determine whether the witness's prehypnotic memory is adequate to justify admission of a posthypnotic identification. Cf. *Watson, supra.*

---

[2] Florida and Washington recently have adopted such a rule. See *Stokes* v. *State*, 548 So. 2d 188, 196 (Fla. 1989); *State* v. *Coe*, 109 Wash. 2d 832 (1988). Other courts have concluded that, in some circumstances, a witness's prehypnotic description can demonstrate that his ability to identify a defendant existed before hypnosis, even if no identification took place before hypnosis. See *People* v. *Centers*, 422 Mich. 951 (1985); *People* v. *McIntosh*, 422 Mich. 951 (1985); *Commonwealth* v. *Romanelli*, 522 Pa. 222 (1989).

In *Kater II*, we emphasized that it is the judge who must resolve the question of admissibility which arises when witnesses testify after having been hypnotized. "Because the hypnotic sessions involved in this case occurred before the date of our opinion in *Kater I*, the Commonwealth's failure to conduct the sessions in accordance with the procedural safeguards enumerated in *Commonwealth* v. *A Juvenile*, 381 Mass. 727, 732 n.8 (1980), does not make inadmissible testimony based on a witness's prehypnotic memory." *Kater II*, *supra* at 533. However, "before admitting proffered testimony, the judge must be satisfied by a preponderance of the evidence presented at a hearing that the testimony is based on prehypnotic memory." *Id.* at 533. The burden of proof is on the Commonwealth to prove prehypnotic memory by a fair preponderance of the evidence. *Kater I*, *supra* at 524. *Commonwealth* v. *A Juvenile*, 381 Mass. 727, 734 (1980).

We examine the record to determine whether the judge in his determinations of fact and rulings separated prehypnotic and posthypnotic memory of the four witnesses and whether the witnesses' trial testimony exceeded their prehypnotic memory.[3]

Before hypnosis McCoy and Berry reported very similar observations of the man they saw in the green car on Dean Street. They both reported that he had dark curly hair, dark-rimmed glasses, and a tan or ruddy complexion. Each prepared a composite likeness which shows a man with dark

---

[3] The trial judge titled some sections of his findings and rulings on the defendant's motion to suppress as the witnesses' "present memory" and proceeded to set forth the witnesses' current memory. The witnesses' present memory was not the proper subject of the suppression hearing. The judge's task at the hearing was only to determine the boundaries of the witnesses' *prehypnotic* memory, so that he could exclude any evidence which exceeded those boundaries or contradicted its substance. If credible testimony was presented at the hearing that a hypnotized witness had revealed a fact before hypnosis, then that fact should have been included in the findings, regardless of the witness's present memory. If no credible testimony was presented showing that a hypnotized witness recalled a fact before hypnosis, then that fact is inadmissible at trial, even if the witness has a clear present memory of the fact at the time of hearing. It is clear from the judge's findings that he did not make these distinctions.

curly hair, and dark-rimmed glasses, but without other distinguishing characteristics.[4]

The Commonwealth's expert, Dr. Martin Reiser, was of the opinion that their testimony was not hypnotically aided. He based his opinion, in large measure, on the testimony of the witnesses, which, he said, was generally the same before and after hypnosis. The judge accepted the Commonwealth's expert's opinion. That was error. There was no attempt by the expert to separate out prehypnotic and posthypnotic memory. The expert's testimony leads toward a conclusion that the methods used during hypnosis tainted the memory of two of the witnesses. Dr. Reiser testified that hypnotizing two witnesses together is an improper procedure because there is a danger that the memory of each witness may be contaminated by overhearing the response of the other witness. Details recited by one witness from her recollection may be overheard by the second witness and become part of the memory of the second witness. McCoy and Berry were hypnotized together. McCoy and Berry also were told that they would visualize the incident and would "zoom in" on particular aspects of the scene. The Commonwealth's expert testified that this technique may put too much pressure on a hypnotized witness to remember details. He testified that when pressure is put on a person to remember an incident, and the person wants to comply, then the witness may fill in gaps in memory with made up material in order to please the questioner.[5] The record before us shows that improper techniques were used to hypnotize McCoy and Berry. The Commonwealth did not show by evidence that before hypnosis either McCoy or Berry was capable of identifying the defendant. On this record, we conclude, therefore, that the Commonwealth cannot now meet its burden of showing by a

---

[4] The trial judge specifically found that McCoy and Berry independently prepared composite likenesses. A police officer who aided in preparation testified that each witness had selected exactly the same features, resulting in identical pictures. Only one composite likeness was introduced at retrial.

[5] According to the expert, this process by witnesses of filling in gaps in memory with psuedo memories is labelled "confabulation."

fair preponderance of the evidence that the identifications of the defendant by McCoy and Berry were not hypnotically tainted. Neither McCoy nor Berry should have been permitted to identify the defendant in court as the driver of the green automobile. Testimony that Berry identified the defendant at the Dunkin' Donuts shop was not shown to be based on prehypnotic memory and should have been excluded, as well as testimony that McCoy or Berry identified the defendant at other court proceedings as the driver of the green automobile.

On the record before us, however, it is not clear whether the Commonwealth could show that McCoy and Berry were capable of positively identifying one particular green automobile before hypnosis. Before hypnosis, Berry and McCoy described the automobile to police as a compact of a particularly distinctive green color. Each witness gave police an object illustrating the unique color of the automobile she saw on Dean Street. These two items are very close in color. Each described the automobile in some detail. Therefore, it may be possible that the Commonwealth could demonstrate that Berry and McCoy would be able to identify the automobile based on prehypnotic memory. Whether the witnesses should be allowed to identify the automobile depends on the outcome of the hearing separating prehypnotic memory from posthypnotic memory. Because the hearing that was held did not accomplish that separation, we do not decide whether, at another trial, McCoy and Berry may identify the automobile or merely describe the details of the automobile as described by them prior to hypnosis. It will be for a judge to weigh the effects of the improper hypnotic procedures used and the evidence of the witnesses' prehypnotic memory in deciding whether Berry and McCoy were capable of identifying the automobile before hypnosis. As to Santos, it is for the judge to determine whether Santos's prehypnotic memory would permit him to identify the automobile.

Because another retrial will be necessary, see section 2, *infra*, we take this opportunity to state again what procedures are required by *Kater I* and *Kater II*. Before the next retrial

the judge should hold a hearing to determine whether the proffered testimony is based on prehypnotic memory.[6] The judge may hear from the witnesses, and from police, friends and others as to what the witnesses told them.[7] From the evidence the judge should determine the substance of each witness's prehypnotic memory. After making that determination, the judge should compare it to the proffered trial testimony and decide if any part of the proffered testimony exceeds the witness's prehypnotic memory. The judge must exclude as inadmissible details about events that the witness remembers for the first time after hypnosis. The record of the witness's prehypnotic memory may contain facts that the witness no longer recalls at the time of the evidentiary hearing. If the witness recalls such facts which the judge determines to be prehypnotic memory at the time of trial, that testimony is admissible.[8]

Although we conclude that the positive identification testimony from the hypnotized witnesses should not have been admitted, these witnesses may testify to their observations on Dean Street made on September 8, 1978. The content of their prehypnotic memory may be established from the oral and written records of the police, from testimony as to what the witnesses reported to others before hypnosis, and from

---

[6] This screening procedure is required only for matters which were the subject of inquiry during the hypnotic session. *Kater I, supra* at 529. Testimony concerning matters that were not discussed under hypnosis is irrelevant.

[7] Oral, written, and recorded statements or testimony from other persons who spoke to the witness before the hypnosis may suffice to establish the boundaries of the witness's prehypnotic memory. We do not think, however, that a hypnotized witness should be barred from testifying at the hearing as to his prehypnotic memory, nor is the motion judge limited to contemporaneously recorded reports of what the witness said before hypnosis. See *Kater I, supra* at 530 n.8 (tape recording of all potential witnesses not required). It is for the motion judge to assess the credibility of the witnesses' testimony.

[8] Opposing counsel may employ cross-examination to attack uncertainties in a witness's present memory at the hearing or the trial, or differences in the witness's recall between the hearing and the trial. Such differences are matters of credibility for the jury.

the testimony of the witnesses themselves. It is proper for these witnesses to testify as to observations they made on September 8, 1978, on Dean Street, as long as the direct testimony does not exceed what a judge determines to be the substance of that person's prehypnotic memory. See note 8.

2. *Sufficiency of the evidence.*[9] We previously have reviewed the sufficiency of the evidence in this case. See *Kater I, supra* at 521 n.3. We concluded then that the case was one for the jury. Essentially the same evidence was introduced at retrial. We adhere to our former conclusion. The trial judge did not err in denying the defendant's motions for required findings of not guilty.

We further conclude that a retrial is required. It will be for the trial judge to determine, in his discretion, what evidence will be admissible at the next retrial. We do not know now what the extent of that evidence will be. We consider it likely, however, that even without eyewitness identifications of the defendant, the Commonwealth will have sufficient evidence to withstand a motion for required findings. The Commonwealth may introduce the composite likeness prepared by McCoy. See *Commonwealth* v. *Weichell,* 390 Mass. 62, 71 (1983), cert. denied, 465 U.S. 1032 (1984). Because police reports of McCoy's interviews with police before hypnosis showed that she had a definite prehypnotic memory of the hair style of the driver of the green automobile, she may testify that a photograph of the defendant showed a hair style consistent with the hair style she observed on the driver of the green automobile. The witness may describe their observations of the incident on Dean Street, subject to the limitations of prehypnotic testimony. One witness who never was hypnotized positively identified the defendant's automobile as the one she had seen in the Dean Street area at the time of the abduction. Berry gave police a shirt and McCoy gave them a comb to illustrate the color of the automobile they saw. These items are admissible. The issue whether McCoy

---

[9] In his brief, the defendant often argues the weight of the evidence rather than the sufficiency.

and Berry may identify the automobile is for the trial judge after determining the extent of their prehypnotic memory. Santos and Lizotte may identify any features of the defendant's automobile which are consistent with their prehypnotic memory.

As at the last retrial, the Commonwealth may introduce other evidence linking the defendant to the abduction. A tire print was discovered near the spot where Mary Lou's bicycle was found which showed specific wear characteristics indicative of defects in the defendant's automobile. A smear was discovered on the front fender of the defendant's automobile which could have been caused by the handlebar plug of Mary Lou's bicycle. Police found a Benson and Hedges cigarette near where the bicycle was found, and found Benson and Hedges cigarettes in the defendant's automobile. Newspapers containing accounts of Mary Lou's disappearance were discovered in the trunk of the defendant's automobile. Although the defendant's automobile had been washed at 1 P.M. on September 8, he washed the automobile again in the late afternoon. Additionally the defendant failed to keep a 5 P.M. appointment. There were inconsistencies between the defendant's statement to police of his activities on September 8 and the testimony of other witnesses.[10]

The Commonwealth's case consists of circumstantial evidence. "It is well settled that a case may be submitted to the jury on the issue of a defendant's guilt on circumstantial evidence." *Commonwealth* v. *Healy*, 393 Mass. 367, 383 (1984), citing *Commonwealth* v. *Casale*, 381 Mass. 167, 174-175 (1980). The evidence here warrants a retrial.

We note that we would remand this case for further proceedings even if the exclusion of the eyewitness identifications left the Commonwealth with less evidence. The principle established in *Burks* v. *United States*, 437 U.S. 1 (1978), that the double jeopardy clause of the Fifth Amendment bars retrial when an appellate court reverses a conviction on the

---

[10] While not relevant to required findings, there is evidence of consciousness of guilt which may be admitted in the discretion of the judge.

basis of insufficient evidence does not bar retrial of this case. "[W]e agree with those cases which hold that the double jeopardy principle does not automatically bar retrial 'where an insufficiency of evidence appeared only when material held on appellate review to have been erroneously admitted was notionally removed from the case.' " *Commonwealth* v. *Brouillet*, 389 Mass. 605, 608 (1983), quoting *Commonwealth* v. *Taylor*, 383 Mass. 272, 284 (1981).

3. *Grand jury indictment.* The defendant next contends that the Commonwealth so impaired the integrity of the grand jury that the indictment must be dismissed. He claims that the Commonwealth withheld exculpatory evidence, relied on hearsay about hypnotically-aided statements, and improperly introduced evidence of his prior criminal record. The defendant filed a motion to dismiss the indictment prior to the first trial, which the judge denied. He could have raised, but did not raise, an objection to this denial during our review of his first conviction. Before the second trial, he again moved to dismiss the indictment, and again the motion was denied.

A defendant is required to present "all his claims of error at the earliest possible time, and failure to do so precludes relief on all grounds generally known and available at the time of trial or appeal." *Commonwealth* v. *Pisa*, 384 Mass. 362, 365-366 (1981). See *Commonwealth* v. *Gilday*, *ante* 45, 46 (1991). Unlike previous cases where, for purposes of *collateral* review, defendants have been deemed to waive issues not raised on direct review, see, e.g., *id.*; *Pisa*, *supra*, the issue here arises for the first time on a second *direct* review. Nevertheless, the logic of our rule that issues available but not argued in the first appeal are waived on any subsequent appeal applies in this situation. Any objections to indictments based on defects in the grand jury proceeding thus have been waived on this appeal as well as on the next retrial.

4. *Right to confront a witness.* The defendant further contends that the defendant's constitutional right to confront adverse witnesses at trial was violated when Lizotte refused to

look at him and refused to attempt any identification of him. In his argument, the defendant relies on State grounds.

. Article 12 of the Massachusetts Declaration of Rights guarantees that "every subject shall have a right . . . to meet the witnesses against him face to face." The "plain meaning" of that right "is that the accused shall not be tried without the presence, in a court of law, of both himself and the witnesses testifying against him." *Commonwealth* v. *Bergstrom*, 402 Mass. 534, 542 (1988). As long as a witness is physically present in the courtroom, the witness is not required to look at the defendant. *Coy* v. *Iowa*, 487 U.S. 1012, 1019 (1988). See *Commonwealth* v. *Melchionno*, 29 Mass. App. Ct. 939 (1990). One major purpose of insuring the right of a defendant to confront a witness is to allow cross-examination, which is "the principal means by which the believability of a witness and the truth of his testimony are tested." *Commonwealth* v. *Funches*, 379 Mass. 283, 292 (1979), quoting *Davis* v. *Alaska*, 415 U.S. 308, 316 (1974). Another purpose of the confrontation guarantee is to afford the jury the opportunity to observe the demeanor of the witness in order better to assess his credibility. *Commonwealth* v. *Bergstrom, supra* at 548. See also *Maryland* v. *Craig*, 110 S.Ct. 3157 (1990) (elements of confrontation are physical presence, oath, cross-examination, and observation of the witness's demeanor).

The requirements of the confrontation clauses of both the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights were met in this case. Lizotte was physically present in the courtroom; she testified under oath; she was subject to extensive cross-examination; and the jury had ample opportunity to observe her testimony and assess her credibility. There was no violation of confrontation rights in the judge's exercise of his discretion not to order the witness to look at the defendant.

The defendant claims that Lizotte's refusal to look at the defendant deprived him of exculpatory evidence. He contends that, if she had been ordered to look at the defendant and answer the question, "Is this the person you saw driving the green car?", she would have answered "no." Lizotte testified

at trial that she had never recognized anyone as the driver of the green automobile, and that she had never identified the defendant as the driver of the green automobile. On cross-examination, Lizotte testified that she had never really looked at the driver of the green automobile. There was no constitutional error in the judge's denial of the request to order the witness to look at the defendant.

5. *Other evidentiary issues.* We address some issues which may arise at another retrial.

Lizotte, with the aid of a policeman, prepared a composite likeness of the man in the green automobile, apparently before she was hypnotized. This composite does not bear a strong resemblance to the composite prepared by McCoy. At retrial, Lizotte testified that she did not recognize the composite which was offered in evidence, that she did not recall a policeman showing her that composite after her session with him, and that she never had been satisfied that the composite she prepared resembled the man she had seen on Dean Street. The judge admitted the composite in evidence, but instructed the jury that they were to consider it only as possible impeachment for Lizotte's testimony. The defendant argues that the jury should have been allowed to consider the composite as substantial evidence of a prior identification by Lizotte.

The defendant recognizes our rule that where a witness does not acknowledge a prior extrajudicial identification, such identification cannot be proved by the testimony of a person who observed the identification, and cannot be admitted for its probative value. *Commonwealth* v. *Daye*, 393 Mass. 55, 61-62 (1984). In these circumstances, the probative value of an identification closer to the time of the incident is outweighed by the risk of error in second-hand reporting. *Id.* at 61. *Commonwealth* v. *Bassett*, 21 Mass. App. Ct. 713, 719 (1986). The defendant urges an exception to this rule where hypnosis has intervened between the prior identification and trial testimony. We decline, however, to establish any special rules of evidence for this situation beyond the rule that the hypnotically-aided testimony is inadmissible be-

cause it is unreliable. Any party at trial runs the risk that a witness's memory may lapse or his story may change when he is on the witness stand. A witness may testify only as to the facts he recalls at any time of trial. This limitation is no different for a hypnotized witness than for any other witness.

Similarly, we apply the same rules of evidence concerning hearsay and the admissibility of prior consistent statements to the testimony of hypnotized witnesses as we do to the testimony of any other witnesses. It is well established that prior consistent statements of a witness may be admitted where the opponent has raised a claim or inference of recent contrivance, undue influence, or bias. *Commonwealth* v. *Mayfield*, 398 Mass. 615, 629 (1986). See P.J. Liacos, Massachusetts Evidence at 168-169 (5th ed. 1981). It is for the trial judge to determine if evidence adduced by the defendant through his cross-examination raises a claim of recent contrivance or undue influence. If he determines that a claim of recent contrivance has been raised, then the Commonwealth may introduce consistent statements made by these witnesses prior to hypnosis to rebut this claim. See *Mayfield*, *supra* at 629; *Commonwealth* v. *Zukoski*, 370 Mass. 23, 26-27 (1976). Thus, depending on the state of the evidence, some of the statements that the hypnotized witnesses made to others may be admissible at another retrial.[11]

The judgments are reversed, the verdicts are set aside, and the case is remanded for further proceedings.[12]

*So ordered.*

---

[11] The defendant argues a number of evidentiary issues. Suffice it to say that the rulings were well within the judge's discretion.

[12] The condition in which the record in this case was transmitted to us was deplorable. The transcripts were not numbered, were not in order, and the transcripts of the motion to suppress hypnotically-aided testimony were not forwarded to us. Although it is neither our function nor responsibility to seek out records not furnished, we did so for the motion to suppress because of that issue's importance to the defendant. It is counsels' responsibility to make certain that those portions of the record and transcript relied on by the parties at trial are before this court.