# United States Court of Appeals
## For the First Circuit

No. 05-1640

JAMES MICHAEL KATER,

Petitioner, Appellant,

v.

MICHAEL T. MALONEY,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Selya, Lynch and Lipez,
Circuit Judges.

Joseph F. Krowski, with whom Law Office of Joseph F. Krowski
was on brief, for appellant.
Susanne G. Reardon, Assistant Attorney General, with whom
Thomas F. Reilly, Attorney General, was on brief, for appellee.

August 14, 2006

**LYNCH**, **Circuit Judge**.  James Michael Kater, who is serving a life sentence for murder and kidnapping, appeals from the district court's denial of his petition for habeas corpus relief under 28 U.S.C. § 2254.  Our review is subject to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996).  Kater's habeas petition raises, inter alia, a due process claim based on the introduction of a prior bad act for the purpose of establishing identity, an unusual voir dire claim, and a claim under the Confrontation Clause related to the introduction of testimony by previously hypnotized witnesses.  We reject Kater's claims, affirm the district court's denial of the petition, and resolve one issue of first impression for this court.

We address Kater's assumption that in a federal habeas proceeding on de novo review of a state court's judgment under Fortini v. Murphy, 257 F.3d 39 (1st Cir. 2001), we may apply a new rule of law, which was not clearly established by existing precedent at the time the state conviction became final.  Our circuit law has not yet addressed this aftermath issue to Fortini, which held that, post-AEDPA, preserved federal constitutional claims on habeas would be reviewed de novo, when such claims were not "adjudicated on the merits in State court proceedings."  28 U.S.C. § 2254(d); Fortini, 257 F.3d at 47.  While we consider such claims "de novo," that does not mean we review those claims as an

-2-

original matter, as if the claims were raised on direct appeal. Rather, the claims of habeas petitioners, even on de novo review under Fortini, continue to be limited by the principles laid out in Teague v. Lane, 489 U.S. 288 (1989), and its progeny, which generally bar claims that require the application or announcement of "new rules" of law.

I.

This case has an over twenty-year history in the courts of Massachusetts. We begin with a thumbnail sketch of that history to set the stage.

Kater was indicted in 1978 in Massachusetts for the kidnapping and murder of a fifteen-year-old girl, Mary Lou Arruda. He was convicted in 1979, but the Massachusetts Supreme Judicial Court (SJC) reversed the conviction because certain hypnotically aided testimony had been introduced at trial. Commonwealth v. Kater (Kater I), 447 N.E.2d 1190 (Mass. 1983). The SJC ordered the trial court on remand to hold a hearing and to admit only such testimony as was based on pre-hypnotic memories. Commonwealth v. Kater (Kater II), 476 N.E.2d 593 (Mass. 1985). After two more

trials ended inconclusively,[1] Kater was tried for a fourth time.[2]

Kater was convicted after his fourth trial, in 1996; this conviction was upheld by the SJC. Commonwealth v. Kater (Kater VII), 734 N.E.2d 1164 (Mass. 2000). It is the affirmance of his conviction at his fourth trial which is at issue here.

Before the fourth trial began, the state trial court ordered that the testimony of previously hypnotized witnesses be limited to facts that had been documented in the record before the witnesses had been hypnotized. Id. at 1177. This was more favorable to Kater than the SJC's directive that pre-hypnotic testimony be separated from hypnotically aided testimony. Id. The trial court also ruled, at motion in limine before trial, that the prosecution could introduce evidence of Kater's state conviction for a similar kidnapping, for the purpose of establishing Kater's identity.[3] Id. at 1172, 1175. The SJC affirmed this ruling. Id. at 1176.

---

[1] After a second conviction in 1986, the SJC reversed the conviction again based on the introduction of hypnotically aided testimony. Commonwealth v. Kater (Kater III), 567 N.E.2d 885 (Mass. 1991). It later affirmed a trial court order suppressing certain evidence that the state had failed to show was based on pre-hypnotic memory. Commonwealth v. Kater (Kater IV), 592 N.E.2d 1328 (Mass. 1992). A third trial ended in a mistrial.

[2] Kater failed in his double jeopardy challenge to the indictment leading to the fourth trial. See Kater v. Commonwealth (Kater V), 653 N.E.2d 576 (Mass. 1995).

[3] The SJC rejected as premature Kater's interlocutory challenge to the admission of this prior bad act evidence. Kater v. Commonwealth (Kater VI), 659 N.E.2d 273 (Mass. 1995).

At jury selection, on Kater's motion and with the Commonwealth's agreement, the state trial court asked potential jurors individually a second round of questions. After describing Kater's prior conviction, the judge asked whether knowledge of that conviction would affect the jurors' ability to accept and understand the presumption of innocence and the limitation on the use of prior bad act evidence to the issue of identification. Id. Seven of fifteen jurors were struck based on their responses to these questions.

The trial court later decided that voir dire on the prior bad acts was inappropriate, and excused the previously selected jurors. Id. It did so for two reasons. First, it found that "if evidence of other crimes were admitted, it would not be extraneous within the meaning of [Mass. Gen. Laws ch. 234, § 28], and voir dire would not be authorized." Id. The court referred to state law "provid[ing] that a trial judge must, for the purpose of determining whether a juror stands indifferent in a case, conduct an individual voir dire of each prospective juror if it appears that a substantial risk exists that an extraneous issue might affect the outcome of the case." Id. (citing Mass. Gen. Laws ch. 234, § 28). The SJC said that, under Massachusetts law, "[a]n extraneous issue is one that goes beyond the record and raises a serious question of possible prejudice." Id. at 1175. Second, the trial court found that "if the evidence [of prior bad acts] were

-5-

ultimately not admitted at trial, the questions would have then contaminated the jury." Id. at 1174. Jury selection then began anew without any inquiry as to Kater's prior conviction.

The SJC affirmed the reasoning of the state trial court on the voir dire issue on state law grounds. Id. at 1174-75 ("Kater's obstacle is that the issue of his prior similar crime was not extraneous. . . . Here, the issue of Kater's prior similar crime did not lie beyond the record. Evidence of the prior similar crime was fully relevant and probative on the issue of Kater's identity as the perpetrator.").

## II.

We briefly recount the facts as found by the state court, which are detailed in Kater VII, 734 N.E.2d at 1170-72. Arruda disappeared in September 1978 while riding a bike near her home in Raynham, Massachusetts. Her bike was found the same day; nearby was a Benson & Hedges cigarette and a car tire track with an acceleration mark and an abnormal tread wear pattern. Two months later, in November 1978, Arruda's clothed body was found tied to a tree. A pathologist testified that Arruda had been tied to the tree while conscious, but that she lost consciousness and that the weight of Arruda's head against the restraint around her neck strangled her. Id. at 1170.

Around the time Arruda disappeared, five individuals saw a green car with a black or silver stripe speeding through the

neighborhood where Arruda had been abducted. Id. Four of these witnesses were hypnotized during the course of the investigation into Arruda's disappearance. Kater I, 447 N.E.2d at 1194. At trial, the five witnesses testified that Kater's car was similar in color, size, and markings to the car they had seen on the day of Arruda's disappearance. Kater VII, 734 N.E.2d at 1171. One person described the driver of the car as a white male with dark curly hair and dark-rimmed glasses. Police developed a composite sketch of the driver based on eyewitness accounts. Id. at 1170.

While Arruda was still missing, Kater was interviewed by the police. The police noted that Kater smoked Benson & Hedges cigarettes, and that his appearance matched both the composite sketch and the description of the driver given by one witness. Kater allowed the police to search his car, a bright green Opel with a black racing stripe. The right front tire tread of the car had a unusual wear pattern consistent with the tire track found near Arruda's bicycle. In the car the police found two cartons of Benson & Hedges cigarettes and two pairs of dark-rimmed glasses. In the trunk of the car, under some luggage, the police found two newspapers, each open to articles about Arruda's disappearance. Kater made a statement to the police as to his whereabouts at the time of Arruda's disappearance, but the SJC found Kater's alibi to have been inaccurate. Id. at 1171.

Kater, in 1969, had pled guilty to a crime which the SJC stated was "strikingly similar" to the one perpetrated against Arruda. Id. at 1176. Evidence of this prior conviction was introduced at Kater's fourth trial for the purpose of establishing Kater's identity as the perpetrator of the crime against Arruda. Kater had abducted a thirteen-year-old girl, Jacalyn Bussiere, who was walking her bicycle on a secluded street. He forced her into his car and drove her to a wooded area. Kater hit Bussiere over the head and tried to force her face into a stream. After Bussiere fought back, Kater forced Bussiere into the car again and drove her deeper into the woods, where he tied her hands, ankles, torso and neck against a tree; this was similar to how Arruda's body had been found tied. Bussiere lost consciousness for some time, but eventually managed to free herself and report the crime to the police. Id. She identified Kater as her assailant. Id. at 1172 n.3.

Kater was convicted of the kidnapping and murder of Arruda, and sentenced to life imprisonment without the possibility of parole. Id. at 1170.

### III.

It is a fundamental principle of the law of federal habeas corpus in non-death-penalty cases that no habeas claim is stated as to state court criminal convictions unless the alleged errors are violations of the Constitution, laws, or treaties of the

United States.  Estelle v. McGuire, 502 U.S. 62, 67, 68 (1991); see also 28 U.S.C. §§ 2241(c)(3), 2254(a).  Errors based on violations of state law are not within the reach of federal habeas petitions unless there is a federal constitutional claim raised.  Estelle, 502 U.S. at 67-68.

Indeed, the question of whether anything at trial violated state law in a non-death-penalty case is no part of a federal habeas court's review of a state conviction.  Id. at 67. This reflects the reality under the Constitution that the states are free to adopt any number of different rules for criminal proceedings so long as the application of those rules does not violate federal constitutional requirements.  See id. at 70 ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial. . . . But it has never been thought that such cases establish this Court as a rule making organ for the promulgation of state rules of criminal procedure." (internal quotation marks omitted) (quoting Spencer v. Texas, 385 U.S. 554, 563-64 (1967))).

The Commonwealth argues for dismissal of the petition on the basis that only state-law claims are asserted.  We agree with the Commonwealth that if nothing other than questions of compliance with state law were at issue, no habeas petition would lie.  There are, though, no clean and clear dividing lines for the federal

courts as to when a state court ruling about state law, on evidentiary or other grounds, may transgress the Constitution. The habeas petition here is framed in terms of violations of federal law, and we deal only with the federal questions presented.

The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." Dowling v. United States, 493 U.S. 342, 352 (1990). The petitioner argues that his state trial was so fundamentally unfair as to violate due process of law under the Fifth and Fourteenth Amendments to the U.S. Constitution. Kater argues that it was unconstitutional to admit certain types of evidence and not to conduct voir dire. He argues that evidence about his prior crime (for which he was convicted in 1969), which was admitted under the exception to the exclusion for prior bad acts evidence for evidence tending to show identity, was constitutionally barred. He also argues that his trial was fundamentally unfair because the trial judge refused to ask voir dire questions describing the evidence of the prior crime, already determined to be admissible, and asking whether the potential jurors would remain unaffected by the evidence. This failure to ask the voir dire questions, he says, resulted in a jury biased against him, in violation of the Sixth and Fourteenth Amendments. Kater also argues that it was unconstitutional to admit testimony from witnesses who were once hypnotized. Finally, he says, the federal Constitution was

offended, under <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307 (1979), when the jury convicted him based on insufficient evidence.

All of these issues were presented in federal constitutional terms to the SJC. The SJC ruled on the sufficiency of the evidence and admission of the prior bad acts in federal constitutional terms, <u>see</u> <u>Kater VII</u>, 734 N.E.2d at 1173, 1175-76, and so we address these claims through the lens of the deferential statutory standards under AEDPA. <u>See</u> 28 U.S.C. § 2254(d). As to these claims, Kater must show the SJC's decision "1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" <u>McCambridge</u> v. <u>Hall</u>, 303 F.3d 24, 34 (1st Cir. 2002) (en banc) (quoting 28 U.S.C. § 2254(d)).

As to the admission of evidence from once-hypnotized witnesses and the voir dire issue, the SJC did not address those issues in federal constitutional terms, so our review is de novo. <u>DiBenedetto</u> v. <u>Hall</u>, 272 F.3d 1, 6-7 (1st Cir. 2001); <u>see</u> <u>also</u> <u>Fortini</u>, 257 F.3d at 47 ("AEDPA imposes a requirement of deference to state court decisions, but we can hardly defer to the state court on an issue that the state court did not address."). Before tackling the merits of Kater's claims, it is important to correct a flawed assumption, present in Kater's argument on the voir dire

-11-

point, as to what "de novo" review under Fortini means and to clarify our standard of review.

In the end, none of these purported errors -- voir dire, introduction of evidence, or sufficiency of evidence -- raises a plausible claim of denial of federal constitutional rights, notwithstanding the very able advocacy by Kater's counsel.

A.    De Novo Review in Habeas Cases

In arguing that voir dire on the effect of prior bad act evidence is constitutionally mandated, Kater points to state court cases, and argues that these cases "suggest the way [the] Supreme Court would rule." Kater wrongly assumes that "de novo" review after AEDPA, which applies when the state court did not adjudicate the presented federal constitutional issue on the merits, see Fortini, 257 F.3d at 47,[4] means that this court can decide the issue as an original matter, whether or not the result would be the announcement of a new rule that has not yet been clearly established by existing precedent. Not so. De novo review under Fortini does not eliminate the need for a habeas court to engage in the analysis mandated by Teague v. Lane, 489 U.S. 288 (1989).

---

[4] There is, of course, the need for a habeas petitioner to have met "certain preliminary criteria before we can reach the merits of his claim," such as fair presentation of claims to the state court, exhaustion of state remedies, and the lack of procedural default. See McCambridge, 303 F.3d at 34.

-12-

Teague and its progeny remain good law after AEDPA. Teague analysis applies in habeas cases filed before AEDPA's effective date. See Schriro v. Summerlin, 542 U.S. 348, 351-52 (2004). Teague analysis applies even in cases to which the AEDPA standard of review, 28 U.S.C. § 2254(d)(1), applies. See Horn v. Banks, 536 U.S. 266, 272 (2002) (per curiam) (noting that "the AEDPA and Teague inquiries are distinct"); see also Sepulveda v. United States, 330 F.3d 55, 66 (1st Cir. 2003) (requiring Teague analysis for claims of federal habeas petitioners under § 2255). Kater's assumption -- that a federal court engaged in de novo review does not ask whether a particular claim is based on already clearly established federal law -- would lead to an end-run around the Teague doctrine.

In its canonical form, Teague generally bars habeas claims based on retroactive application of "new rules" announced after a state conviction has become final.[5]  489 U.S. at 310 (plurality opinion). This rule has also been interpreted to mean that habeas claims requiring the announcement of new rules are also generally barred. See Saffle v. Parks, 494 U.S. 484, 487-88 (1990) ("As [petitioner] is before us on collateral review, we must first determine whether the relief sought would create a new rule [under Teague]. If so, we will neither announce nor apply the new rule

---

[5] The general rule is subject to exceptions not relevant here. See Sepulveda, 330 F.3d at 59-60 (describing the exceptions).

sought by [petitioner] unless it would fall into one of two narrow exceptions."  (citations omitted)).

"To apply the paradigm of nonretroactivity required by Teague, we must determine when the petitioner's conviction became final and 'whether a state court considering [the petitioner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.'"  Curtis v. Duval, 124 F.3d 1, 5 (1st Cir. 1997) (emphasis added) (quoting Saffle, 494 U.S. at 488).  In other words, a rule is new under Teague if it is not "compelled by existing precedent."  Id.; see also Beard v. Banks, 542 U.S. 406, 413 (2004) (question under Teague is whether, as of the time the conviction became final, the rule was "'dictated by then-existing precedent'" (quoting Lambrix v. Singletary, 520 U.S. 518, 527-28 (1997))).

The Teague analysis, while different than the AEDPA standard, is related to AEDPA review in at least one sense.  That is because, under AEDPA, the inquiry on habeas is whether the habeas claim is based on "clearly established Federal law."  28 U.S.C. § 2254(d)(1); see also Williams v. Taylor, 529 U.S. 362, 412 (2000).  Whatever the differences between the Teague analysis and the standard of review in AEDPA, the focus of both is, in essence, on the substantive standards set by clearly established federal law.  Whether habeas review is under the deferential standard

provided in § 2254(d)(1) or under the de novo standard of Fortini, state habeas petitioners may not seek release on federal law grounds which have yet to be clearly established. Thus, in this case, it is irrelevant whether (as the petitioner asserts) the Supreme Court might someday recognize a constitutional right to voir dire on prior bad acts evidence. The question, under Teague, is whether such a constitutional right was clearly established by existing precedent at the time the state conviction became final.

B.        Claims Related to Kater's Prior Conviction

We start with what may be the most important issue to Kater -- the arguments based on use of evidence of his prior conviction. It is commonly said that "mere" errors under state law in the admission of evidence are not cognizable under federal habeas review. See 1 Hertz & Liebman, Federal Habeas Corpus Practice and Procedure § 9.1, at 411-12 (4th ed. 2001). This means that the question is not whether the admission of the evidence was state-law error, but whether any error rendered the trial so fundamentally unfair that it violated the Due Process Clause. See Petrillo v. O'Neill, 428 F.3d 41, 44 & n.2 (1st Cir. 2005); see also Fortini, 257 F.3d at 47 ("[N]ot every ad hoc mistake in applying state evidence rules, even in a murder case, should be called a violation of due process; otherwise every significant state court error in excluding evidence offered by the defendant would be a basis for undoing the conviction.").

1.      Admission of Prior 1969 Conviction

Kater argues that the evidence of his prior conviction was not in fact relevant to identity under Massachusetts state law, and that this mistake was so serious as to be federally cognizable. He also argues that the evidence, even if thought to be relevant to identity, was so prejudicial as to make his trial fundamentally unfair.

He also complains, incorrectly, that the state court should have been bound by the federal law of the case doctrine and therefore should have excluded the prior bad acts evidence because it had not been admitted in the prior three trials. The federal law of the case doctrine does not apply to state courts. See Estelle, 502 U.S. at 67-68; see also Arizona v. California, 460 U.S. 605, 618 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power.").

It is, though, still possible that admission of the evidence was fundamentally unfair so as to prejudice Kater. Kater makes this argument, and says that the Commonwealth cannot have it both ways. That is, when Kater invoked the Double Jeopardy Clause to block his fourth trial, the state courts ruled against the claim, finding there was adequate evidence in the record, without admission of the prior bad acts, to support the conviction in a trial where the evidence was not introduced. He argues that this finding that the prior 1969 conviction was not necessary to his

-16-

conviction became the law of the case. As such, it was surplusage to admit the prior bad acts, and prejudicial to him to do so.

On extreme facts, it may be theoretically possible to find that a state court's evaluative judgment -- that the prejudicial effect does not substantially outweigh the probative value -- was such an unreasonable application of clearly established federal constitutional standards as to result in a fundamentally unfair trial. In practice, such a case -- if one exists -- will be very rare. The SJC's conclusion that the bad act evidence of Kater's prior conviction showed identity was quite reasonable, and while adverse to Kater, was not unfairly prejudicial. The evidence powerfully went to identity. The SJC recounted the following similarities between Kater's past crime and the Arruda case: both victims were young girls, both were abducted on a rural residential road and placed in a car, both were brought to a dense wooded area, both were tied to a tree in a similar manner, both were bound around the neck in such a way that strangulation might result, and both were left in isolated areas of the woods. Kater VII, 734 N.E.2d at 1176 & n.7. As the SJC found, the two cases were "strikingly similar," with a "modus operandi . . . so distinctive as to make the evidence highly probative." Id. at 1176.

We agree with the SJC, and see no basis for any conclusion that this evidence of his prior conviction unfairly

prejudiced Kater, much less that the trial was fundamentally unfair.[6]

                    2.       Voir Dire on Prior Conviction

Kater's innovative voir dire argument rests on a mistaken view of the purpose and limits of a defendant's federal constitutional right to conduct voir dire for bias.  Again, states may make different choices as to this topic; our concern is Kater's federal constitutional right.

Kater's argument is based on these propositions:

1.  The Fourteenth Amendment requires that jurors be impartial. Morgan v. Illinois, 504 U.S. 719, 729 (1992).

2.  The U.S. Supreme Court has not endorsed the distinction made by the state court between requiring voir dire questioning on extraneous issues -- if it appears that a substantial risk exists that the extraneous issue might affect the outcome of the case -- and not requiring it on non-extraneous issues relevant to and in the record of the case.  He argues that if the U.S. Supreme Court were to address the issue, it would conclude, as apparently have the state courts of California, see People v. Chapman, 18 Cal.

---

[6] Kater also argues that the admission of the prior conviction violated the Double Jeopardy Clause.  Kater argues that he is being punished twice for the 1968 crime against Bussiere: once because of his conviction in 1969, and again by the admission of the 1969 conviction at his trial for Arruda's kidnapping and murder. Kater's argument raises no question under the Double Jeopardy Clause.  In no sense is admission of prior bad act evidence "punishment" within the meaning of the Double Jeopardy Clause.

-18-

Rptr. 2d 738 (Cal. Ct. App. 1993) (relying on People v. Ranney, 1 P.2d 423 (Cal. 1931)),[7] that there is a Sixth Amendment right to question jurors on possible prejudice or bias due to defendant's prior felony conviction. We note that this step of the argument is based on the erroneous assumption rejected above, that de novo review under Fortini eliminates Teague review.

3. Kater argues, in any event, that the record here shows that when the questions were asked about his prior bad acts, almost half of the questioned jurors said they would have problems following the court's instructions, and that this entitled Kater to insist that questions be asked at voir dire about the effects of evidence as to his prior conviction.

We address Kater's argument on this issue with reference to clearly established law at the time Kater's state court conviction became final,[8] as required by Teague, focusing on the Supreme Court cases on which Kater builds his argument.

---

[7] Kater also relies on other state cases requiring voir dire on a defendant's prior convictions, but all of those cases rely on interpretations of state, not federal, law. See State v. Collin, 741 A.2d 1074 (Me. 1999); People v. Hosier, 116 N.Y.S. 911 (N.Y. App. Div. 1903); Staggs v. State, 29 P.2d 135 (Okla. Crim. App. 1934); State v. Ziebert, 579 P.2d 275 (Or. Ct. App. 1978).

[8] "A state conviction and sentence become final for purposes of [the Teague] analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." Caspari v. Bohlen, 510 U.S. 383, 390 (1994). The SJC handed down its final opinion in August 2000, and no petition for certiorari was filed.

-19-

The Supreme Court has explained that federal authority over voir dire in cases tried in state courts is "limited to enforcing the commands of the United States Constitution." Mu'Min v. Virginia, 500 U.S. 415, 422 (1991).[9] So far, the Supreme Court has recognized a defendant's constitutional right to voir dire questioning only about whether jurors might be prejudiced against defendant because of his race. See Ham v. South Carolina, 409 U.S. 524, 526-27 (1973); Aldridge v. United States, 283 U.S. 308, 314-15 (1931). Even then, the inquiry in non-death-penalty cases need not be made in every state court case in which the races of the victim and the defendant are different. Ristaino v. Ross, 424 U.S. 589, 597-98 (1976); see generally 5 LaFave, et al., Criminal Procedure § 22.3(a), at 293 (2d ed. 1999) ("[T]he Court has as yet declined to extend the [Ham] doctrine to matters other than racial prejudice.").

Death penalty cases present special concerns about what voir dire may be constitutionally required, and there are special voir dire rules in such cases. See Turner v. Murray, 476 U.S. 28, 36-37 (1986) (holding that Due Process Clause entitled death-penalty-eligible defendant to voir dire questioning on racial bias where defendant was accused of interracial crime); see also Morgan

_____

[9] The Court carefully distinguished between constitutional requirements which states must meet and the exercise of its broader supervisory authority over cases tried in federal courts. Mu'Min, 500 U.S. at 422, 424.

-20-

v. <u>Illinois</u>, 504 U.S. 719, 738-39 (1992) (state trial court, under Due Process Clause, may not refuse to inquire into whether a potential juror, regardless of facts in the case, would automatically impose the death sentence); 5 LaFave, et al., <u>supra</u>, § 22.3(a), at 295.

To date, the Court has recognized no such constitutionally compelled right to voir dire in other contexts, including where the claim involved potential voir dire about extensive and prejudicial pretrial publicity, resulting in further questioning jurors about the content of materials they had seen after they had declared themselves impartial. <u>See</u> <u>Mu'Min</u>, 500 U.S. at 431-32.

There is no claim here of prejudicial bias of potential jurors based on race or, indeed, any other suspect classification. There is no claim the jurors prejudged the matter based on adverse pretrial publicity. Kater was not sentenced to death, but to life imprisonment, and the voir dire requested did not address sentencing at all. All of the categories of cases for which the Supreme Court has recognized a constitutional right to voir dire have involved preexisting views, not based on the evidence in the case, which prospective jurors may bring into the courtroom with them that impair their ability to fairly consider the evidence.

It is true that some state courts have concluded that, as a matter of state policy, they will permit or even require voir

-21-

dire on whether a juror who has heard evidence of a defendant's prior bad acts can still follow the judge's instructions about the limited purpose for such testimony. Massachusetts has chosen not to follow that path, and requires voir dire questioning only where there is a "substantial risk . . . that an extraneous issue" -- "one that goes beyond the record and raises a serious question of possible prejudice" -- "might affect the outcome of the case." Kater VII, 734 N.E.2d at 1174-75 (citing Mass. Gen. Laws ch. 234, § 28).

The question is whether, given the clearly established federal law at the time Kater's conviction became final, Massachusetts was compelled by the federal Constitution to require such voir dire on the effect of evidence, yet to be admitted, of defendant's prior bad acts. Massachusetts was not under any such constitutional compulsion. Kater had no constitutional entitlement to question potential jurors on the effect of the prior bad act evidence.

C.        Testimony From Previously Hypnotized Witnesses

Kater starts from the firm foundation that the Sixth Amendment Confrontation Clause guarantees that prosecution trial testimony be subject to testing by the defendant via the opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 61 (2004) (stating that the Confrontation Clause "commands . . . that reliability be assessed in a particular manner: by

testing in the crucible of cross-examination"). Kater argues that his Confrontation Clause rights were violated by permitting testimony from witnesses who had been hypnotized. See Clay v. Vose, 771 F.2d 1, 4-5 (1st Cir. 1985). He also argues that the introduction of this testimony violated due process and rendered his trial fundamentally unfair.

In particular, Kater argues that the hypnosis led the witnesses to become "convinced of the absolute accuracy" of their testimony, supported by pre-hypnotic documentation, that Kater's car was similar in color, size, and markings to the car they had seen on the day of the abduction, making them impermeable to cross-examination. We rejected a similar argument by a habeas petitioner in Clay, a case in which the state court (unlike the state court here) had not restricted witness testimony only to previously documented facts. Id. at 3-5.

The risks that may be posed by testimony of previously hypnotized witnesses are simply not present here. At Kater's last trial, the trial judge allowed previously hypnotized witnesses to testify only as to facts that were documented before the hypnosis procedures were performed. The SJC held that "such limitations on the witnesses eliminated the risk that their testimony might be affected by hypnosis." Kater VII, 734 N.E.2d at 1177. Admission of this evidence cannot possibly be said to have deprived the petitioner of a fundamentally fair trial.

-23-

D.        Sufficiency of Evidence

The Due Process Clause requires the prosecution to prove beyond a reasonable doubt every element of the offense. In re Winship, 397 U.S. 358, 364 (1970). The SJC concluded, under the federal Jackson standard, that the evidence was sufficient. Kater VII, 734 N.E.2d at 1172-73; see Jackson, 443 U.S. at 319 ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). Although the AEDPA standard applies, even if we were to review this sufficiency question de novo, we would agree.

E.        Other Claims

Kater argues the trial was fundamentally unfair under the Due Process Clause because of the loss or destruction of evidence. The SJC extensively analyzed these claims and rejected them. Whether viewed de novo or through the AEDPA lens, we conclude the claims individually and collectively do not raise a claim of constitutional dimension.

The dismissal of the petition for habeas corpus is affirmed.